CASE 45—ACTION BY CITY OF LEXINGTON AGAINST W. H.
    HENDERSON AND OTHERS TO CLOSE AN ALLEY
    IN SAID CITY.—June 9, 1908.

# Henderson v. City of Lexington

Appeal from Fayette Circuit Court.

WATTS PARKER, Circuit Judge.

From the judgment defendants appeal—Affirmed.

1. Eminent Domain—What Constitutes Taking—Vacation of Pub-
   lic Highway. The closing of a public street, alley or high-
   way is a taking of property within Const. sec. 13, which pro-
   vides that no man's property shall be taken or applied to
   public use without the consent of his representatives and
   without just compensation being made, and section 242, de-
   claring that corporations and individuals invested with the
   privilege of taking private property for public use shall make
   just compensation.
2. Same—Necessity of Vacation for Public Purpose.—To authorize
   the city to close a street or alley, the closing must be neces-
   sary for a public purpose.
3. Same—Taking Property—What Constitutes—Determination.—
   Whenever it is attempted in the interest of a private cor-
   poration to take private property for public use, it is for the
   courts to decide whether the use intended is a public one.
4. Same—Statutory Provisions—Validity.—A statute attempting
   to give a private or municipal corporation authority to take
   private property, and to deny to the courts the right to say
   whether the taking was necessary for a public use, would
   be void.
5. Same—Presumptions.—When a private corporation desires to
   take private property, it must affirmatively show that the
   property is needed for its use in the performance of its duties
   to the public, but, when a municipal corporation, undertakes
   to exercise the power of eminent domain, it will be presumed
   that it is done in the interest of the public and necessary for

public use, and the burden of showing the contrary will be on those objecting to the proceeding.

6. Same.—Act March 22, 1906 (Acts 1906, p. 456, c. 130, providing for the vacation of streets and alleys in cities, is not unconstitutional in failing to provide for submission to the judiciary of the question of public use, as it will not be assumed that the Legislature intended to take from the courts the consideration of such question.

7. Same—Legislative Questions—Necessity of Taking.—In eminent domain proceedings the question of necessity of the taking is distinct from the question of public use, and belongs to the legislative department of the government.

8. Same—Exercise of Power—Decision of Municipality—Effect.— When a city council exercises the power of eminent domain, the motives that influenced it will not be inquired into unless flagrant wrong has been perpetrated on the public, and valuable rights have been surrendered for the benefit of private individuals.

9. Same—Closing of Alley—Benefit to Railroad Companies.—The closing of an alley was for a public use, where, in connection with such closing, a viaduct was constructed furnishing a safe and convenient passageway and relieving travelers of the dangers incident to a railroad grade crossing in the alley, and it was immaterial that the railroads desiring the use of the alley closed were benefited thereby.

10. Same—Proceedings—Necessary Parties—Persons Entitled to Compensation.—In proceedings to close part of an alley, the only persons entitled to compensation, and who are necessary parties, are those who own property abutting on the alley in the block affected.

11. Municipal Corporations—Streets and Alleys—Vacation—Effect of Dedication.—A city may vacate an alley, though it was conveyed to and accepted by it under a deed providing that it should always remain free and open as a public street or alley.

12. Eminent Domain—Assessment of Damages—Separate Trials.— In proceedings to assess damages from closing an alley, the question involved as to all of the abutting owners being identical, the court refused separate trials.

13. Same—Instructions.—In proceedings to assess compensation for closing an alley, the abutting owners could not complain of an instruction authorizing the jury to find the damage to be the difference in the value of the property to the owner before and after the alley was closed; such instruction being more favorable to them than was warranted.

14. Same—Measure of Damages.—On the closing of an alley, the abutting owners are entitled to the difference in the market value of the property with the alley open and its market value with the alley closed.

15. Same—Injury to Business.—The owner of property abutting on an alley is not entitled to compensation for injury to his business caused by vacating the alley.

16. Same—Instructions.—In proceedings to assess compensation for closing an alley, it appeared that, in connection with closing the alley, a viaduct was constructed immediately adjoining the alley closed, and that under the viaduct was a vacant space open to public use as a highway, which certain railroads were entitled to use for the purpose of business, but the public could not be excluded therefrom. Held, that an instruction authorizing the jury to take into consideration such open space was proper.

17. Same—Review—Verdict—Amount of Damages.—The verdict of a jury assessing damages for closing an alley will not be reviewed where the damages are not so inadequate as to indicate that it was the result of passion or prejudice.

ALLEN & DUNCAN for appellants.

1. This proceeding, while nominally a suit to close Ayres Alley, is actually a suit to condemn the private easements in the alley for the benefit of the railroad companies, in consideration of the payment by the companies of part of the cost of building the viaduct, and their agreement to pay one-half the damages assessed on account of the closing of the alley in order to fulfill and the city's grant of the exclusive use in perpetuity of the closed portion. This the city had no power to do, because:

(a) It can not grant to a railroad company the exclusive use of a highway. (Commonwealth of Ky. v. City of Frankfort, 92 Ky. 149; Ruttle v. City of Covington, 10 Ky. Law Rep. 766; Sherlock v. Kansas City Ry., 142 Mo. 172, 64 Am. St. Rep. 551).

(b) A city can not sell or lease its highways. (Buckner v. Trustees of Augusta, 1 A. K. Mar. 9; Trustees of Augusta v. Perkins, 3 B. Mon. 437; Labry v. Gilmour, 89 S. W. 231; 28 Ky. Law Rep. 311).

(c) A city can not convey property held in public trust or disable itself from the performance of its trust obligation. (Roberts v. City of Louisville, 92 Ky. 95, 17 S. W. 216; Elliott on Roads and Streets, 2nd Ed., sec. 875, 879.)

(d) The mere closure of a street is not such a municipal use as will authorize the taking of the rights of property in it by

Henderson v. City of Lexington.

·condemnation proceedings. (Martin v. City of Louisville, 79 Ky. 30.)

(e) A mere money consideration to be paid to a city is not a public use for which private property can be taken from one person and given to another person or corporation. (City of Louisville v. Bannon, 99 Ky. 74.)

(f) The power to close or vacate a public highway can not be invoked for the purpose of granting to an individual or corporation the use of the highway. The city cannot do indirectly what it has no power to do directly. (Smith v. McDowell, 148 Ill., 51, 22 L. R. A. 393; Van Witsen v. Gutman, 79 Mc. 405, 29 Atl. 608, 24 L. R. A. 403; Williams v. Carey, 73 Ia. 194, 34 N. W. 813; Horton v. Williams, 99 Mich. 423, 58 N. W. 369.)

SHELBY & SHELBY for appellee.

MORTON, WEBB & WILSON and J. EMBRY ALLEN, City Solicitor, of counsel.

PROPOSITIONS.

1. The appeal of McAllister and of the Wrights should be dismissed; because it is not prosecuted from any order which, as to them, is appealable.

2. Even if there were an appeal here which McAllister and the Wrights could properly prosecute there should be an affirmance as to them; because:

(a) The pleadings which were offered by them and rejected are not properly made part of this record. (New York Life Ins. Co. v. Brown's Admr., 66 S. W. 614, 23 Ky. Law Rep. 2070; Bamberger, Bloom & Co. v. Kingston, 7 Ky. Law Rep. 360; Cont. Fire Ins. Co. v. Adams, 8 Ky. Law Rep. 269; L. & N R. R. Co. v. Finley, 86 Ky. 297.)

(b) Even if the rejected pleadings could be properly treated as part of this record the ruling of the lower court as to them was correct, since McAllister and the Wrights do not abut at all on any portion of the alley sought to be closed. (Transylvania University v. City of Lexington, 3 B. M. 27; Gargan v. L. N. A. & C. Ry. Co., 89 Ky., 218-21.)

3. The Act permitting cities of the second class to close, or vacate, streets and alleys, and prescribing the method of procedure (Acts 1906, p. 456) is constitutional. (Gargan v. L. N. A. & C. R. Co., supra; Haller v. City of Louisville, 107 S. W. 741).

4. It is no valid objection to the right of a city to proceed to vacate a street that it has not at the time the proceeding is in-

stituted made provision for the payment of damages that may be awarded to abutting owners.

5. The objection by appellants that the city is precluded from exercising its right of closure by the terms of the deed under which it received title to Ayres Alley is untenable; because:

(a) The plea presenting this defense and setting up the terms of the deed was rejected by the lower court, and was not properly made part of this record. (See authorities II, sub-division I.)

(b) The terms of the deed do not prevent the city, from closing and abandoning the alley as a public highway.

6. The closing or vacating of a public street involves an impairment of the abutting property owner's easement of ingress and egress. This is a "taking" of private property through the exercise of the power of eminent domain. (Maydwell v. City of Louisville, 116 Ky. 888).

7. When the use or purpose for which the power of eminent domain is to be exercised is judicially determined to be, or, as here, is confessedly, a public one, the question as to the necessity or expediency for the exercise of the power in a given instance is essentially a political one to be determined by the legislature or the agency to whom the legislature has delegated the power. (Lewis on Eminent Domain, secs. 238-9; Elliot on Roads and Streets, sec. 1900; 15 Cyc. 631; Boom Co. v. Patterson, 98 U. S. 406; Shoemaker v. U. S., 147 U. S. 298, 37 L. Ed. 184; Monographic Note in 88 Am. St. Rep., 939; Cooley's Const. Lim., (1st Ed.), p. 538; Hayford v. Bangor, —— Me. ——; 66 Atl., 731; Knoblauch v. City of Minneapolis, 56 Minn. 321, 57 N. W. 929; Chicago, R. I. & P. R. R. Co. v. Town of Lake, 71 Ill., 335; Treacy v. E. L. & B. S. R. R. Co., 80 Ky. 265-6).

8. The motive of the legislature or its delegated agency in exercising the power of eminent domain, where the purpose is a public one, such as the vacation of a highway, is not subject to judicial inquiry. (Cooley's Const. Lim. (1st Ed.), pp. 186, 208; Sunberry, &c., R. R. Co. v. Cooper, 33 Pa. St. 283; Taylor v. Beckham, 108 Ky. 295-6; Monographic Note, 88 Am. St. Rep. 937; Matter of City of Buffalo, 15 N. Y. Supp. 123.)

9. It was entirely competent and proper for the City of Lexington to agree that it would close or vacate the segment of Ayres Alley in question in consideration of the Railway Companies paying half the cost of widening the alley and construct· ing an overhead viaduct furnishing a safe and convenient means of public travel between Main and High Streets; especially when such agreement was made to induce the location of a union passenger station at the place in question, the operation of which would make the segment of the alley agreed to be closed unsafe

Henderson v. City of Lexington.

for use by vehicles and pedestrians.   (Helm v. Short, 7 Bush
623; Vacation of Union St., 140 Pa. St. 525, 21 Atl. 406; Matter of
the Application of Mayor, &c., of New York, 135 N. Y. 253; 31
Am. St. Rep. 825; Dwyer v. Mayor, &c., of Baltimore, 140 Fed.
886-7; Weage v. C. & W. I. R. R. Co., 227 Ill. 421; Summerfield
v. Chicago, 197 Ill. 270.)

10. It·was proper for the lower court to try the question of
damages as to all the defendants before one jury and at the same
time.   (Acts 1906, pp. 457-8; 7 Encyc. of Pl. & Pr. 503.)

11. The instructions given upon the trial were correct.   (Cov-
ington S. R. Transfer Co. v. Piel, 87 Ky. 276; Madisonville, H.
& E. R. Co. v. Ross, 103 S. W. 331, 31 Ky. Law Rep. 584; City of
Louisville v. Hegan, 49 S. W. 532, 20 Ky. Law Rep. 1532; L. &
N. R. R. Co. v. Cumnock, 77 S. W. 933, 25 Ky. Law Rep. 1330.)

OPINION OF THE COURT BY JUDGE CARROLL—Affirm-
ing.

This controversy grows out of the attempt of the
city to close an alley.   The record presents a number
of questions that will make it necessary to state at
considerable length the respective contentions of the
parties, and, to afford a better understanding of the
local situation, the following map has been copied
from the record:

The alley in question is known as Ayres alley. It was 18 feet wide, and extended from Main street to High street, crossing Water street, which runs parallel with and about midway between Main and High streets. Water street has for some years been occupied almost entirely by the railroad tracks of the Chesapeake & Ohio Railway Company, and at the

point where it crossed Ayers alley there were some
four tracks. As a result of the occupation of Water
street by the railroad, and the movement of trains
and engines thereon, the alley crossing was excep-
tionally inconvenient and dangerous for vehicles and
the traveling public. Three of the railroads entering
Lexington, two of them having depots and terminal
facilities in different parts of the city, desired to erect
a union station into which all their passenger trains
might run. This movement upon the part of the rail-
roads met with the approval of the city authorities,
and the result was a proposition upon the part of the
railroad companies to erect a union station fronting
on Main street, west of Ayres alley, and extended back
to Water street, on which street the train sheds for
the accommodation of passengers in entering and
leaving trains should be located. As a part of this
scheme for the erection of the union station, it was
contemplated that Ayres alley should be closed and
a viaduct constructed from Main to High streets im-
mediately west of and parallel with Ayres alley. The
result of the negotiations between the city and the
railroad companies was the erection of an ample and
attractive station at the place proposed and the via-
duct. This viaduct, where it crosses Water street, is
elevated so as to permit the passage of trains. It is
43 feet wide, substantially built, and affords safe and
easy passageway both for pedestrians and vehicles
between the two streets. When the arrangement for
the erection of the viaduct and the station had been
perfected, the city enacted an ordinance, directing the
closing of so much of Ayres alley as lay between a
point 236 feet from the curb line of Main street to a
point 192½ feet from the curb line of High street. In
other words, under the ordinance, the alley was closed

by a wall erected on each side of Water street, so as
to effectually prevent persons who used the alley on
either the Main street or High street side from cross-
ing Water street; the purpose being to have Water
street at this point practically free for the use of the
railroads that occupied it.  The ordinance recited in
a preamble the reasons for closing that part of the
alley heretofore described, and directed the city
solicitor to institute an action in the Fayette circuit
court for the purpose of closing that portion of the
alley described in the ordinance.  It was enacted
under the authority of an act of the General Assem-
bly, approved March 22, 1906 (Acts 1906, p. 436, c.
130), providing, in part, that: "Upon the adoption of
an ordinance by the general council authorizing and
directing the closing of the whole or any portion or
a street or alley or other public highway within the
limits or jurisdiction of the city, it shall be the duty
of the city solicitor to institute an action in the cir-
cuit court for the purpose of having the same closed,
and to such action all the owners of ground in the
squares of lots divided by such street, alley or high-
way, or the portion thereof proposed to be closed, shall
be made defendants; and if all of such defendants are
competent to act for themselves and fail to object to
the closing prayed for, then the court shall render a
decree accordingly; but if any of said defendants ob-
ject, or are under disability other than coverture, the
court shall impanel a jury, which shall hear evidence
and determine the amount of compensation in the form
of damages to be paid to each of such defendants.  The
court shall thereupon direct that said street, alley or
other highway be closed upon payment to each of such
defendants of the amount of damages awarded to him,
or, if any defendant refuses to accept such payment

or be for any reason unable to do so, upon payment into court of the amount awarded such defendant or defendants." As directed by the ordinance, the city solicitor brought this action, naming as defendants therein the railroad companies, who were equally interested with the city in its closing, and Alice McConathy, Mary E. O'Rear, W. H. Henderson, M. E. Combs, and W. E. Barron, the only persons who owned property abutting on the alley between Main and High streets. These property owners objected to the closing of the alley upon various grounds, some of which will be later noticed. The case coming on for trial, a jury was impaneled to assess the damages, and awarded to Henderson $3,500 to O'Rear $100, giving nothing to Barron. From the judgment upon this verdict, these parties prosecute this appeal.

Pending the action James McAllister, H. E. Wright, and J. P. Wright, who owned property fronting on Main street east of the alley and running back to Water street, offered to file their separate petitions to be made parties defendant. Upon objection by the city, their tendered pleadings were rejected. They also appealed, but have dismissed their appeal. Among the questions presented by counsel for appellants are: First. The constitutionality of the act of 1906. Second. The right of the city to close Ayers alley. Third. The necessary parties to the proceeding. Fourth. The right of each of the parties to have a separate trial. Fifth. The admission of evidence as to the amount of damage resulting to each of the parties, and the competency of other evidence rejected. Sixth. The correctness of instructions upon the measure of damages. Seventh. That the verdict of the jury is grossly inadequate. Eight. Whether or not the alley was closed to carry out an illegal agreement

between the city council and the railroad companies for the purpose of granting to the railroad companies that portion of the alley proposed to be closed.

Taking up these questions in the order named, which is also the order of their importance from a public point of view, we will first consider the act of 1906. It will be observed that, under this act, the council may adopt an ordinance directing the closing of a street, alley, or public way, and thereupon an action shall be instituted against the owners of ground in the squares or lots divided by the street, alley or way proposed to be closed; and, if they object to the closing, the court shall impanel a jury to hear evidence and determine the amount of compensation to be paid. Under this act the city council is empowered to determine the necessity for the closing, as well as the question of whether the closing is for a public use; the only matter left by the terms of the act to the courts being to impanel a jury to ascertain the amount of compensation. The serious objection urged to the validity of this act is that it invests the city council with the sole authority to decide whether the closing is necessary for public purposes, apparently denying to the courts the right to inquire into this question. Section 13 of the Constitution of the state provides in part that: "Nor shall any man's property be taken or applied to public use without the consent of his representatives, and without just compensation being previously made to him." And section 242 declares that: "Municipal and other corporations and individuals invested with the privilege of taking private property for public use shall make just compensation for property taken, injured or destroyed by them; which compensation shall be paid before such taking, or paid or secured at the election of such corporation or indi-

vidual before such injury or destruction.'' It is ad-
mitted that, the closing of a public street, alley, or
highway is a taking of private property within the
meaning of these constitutional provisions, and that
compensation must be made to the abutting owners,
and, further, conceded that the closing must be neces-
sary for public purposes. Indeed, these two prin-
ciples are too well settled to need more than the mere
citation of the authorities that support them. Tran-
sylvania University v. City of Lexington, 3 B. Mon.
25, 38 Am. Dec. 173; Lexington & Ohio R. Co. v.
Appelgate, 8 Dana, 289, 33 Am. Dec. 497; Gargan v.
Louisville, New Albany & Chicago R. Co., 89 Ky.
212, 12 S. W. 259, 11 Ky. Law Rep. 490, 6 L. R. A.
340; City of Louisville v. Bannon, 99 Ky. 74, 35 S. W.
120; Bannon v. Rohmeiser, 90 Ky. 48, 13 S. W. 444,
29 Am. St. Rep. 355; Cooley's Constitutional Limi-
tations, p. 651. So that the question narrows down to
the proposition: Is it essential to the validity of an
act like the one under consideration that the courts
should be given the right and discretion to pass upon
the question whether or not the taking is for a
public purpose when this issue is made, or can the
General Assembly of the state by a legislative act
deprive the courts of the power to inquire whether
or not the taking is necessary for a public purpose. In
the consideration of this question it should not be
overlooked that, although public corporations cannot,
except for public purposes, take without his consent
the property of the individual, yet there is a difference
as we will presently point out between taking private
property for the use of a private corporation and
taking property by a municipal corporation for the
use of the municipality.

Whenever it is attempted in the interest of a private

corporation to take private property and devote it to
a public use, the question as to whether the use to
which it is to be put is or not a public one rests with
the courts to decide. This principle is well settled in
this state. In Tracy v. Elizabethtown, Lexington
& Big Sandy R. Co., 80 Ky. 259, 3 Ky. Law Rep.
813, a proceeding was instituted by a railroad com-
pany to take by condemnation for its use the land
of an individual. No evidence was offered by either
party relative to the character of the use or the
necessity of the taking, although the property
owner denied that the taking was necessary
for a public use. The court, after holding that as an
issue was made upon this point the burden was upon
the railroad company to show that the property
desired to be taken was intended for a public use,
said: "For if the use be not public, or no necessity
for the taking exists, the Legislature cannot authorize
the taking of private property against the will of the
owner, notwithstanding compensation may be re-
quired. The courts cannot control or supervise the
propriety or policy of the condemnation authorized
by the Legislature. But this uncontrolled power does
not authorize the Legislature to so determine that
the use is public as to make the determination conclu-
sive upon the courts. * * The existence of the public
use in any class of cases is a question to be determin-
ed by the courts.' " To the same effect is Chesapeake
Stone Co. v. Moreland, 126 Ky. 656, 104 S. W. 762,
31 Ky. Law Rep. 1075. And this rule which is appli-
cable to municipal or public corporations is not
peculiar to the jurisprudence of this state, but is the
one generally prevailing. Thus it is said in Lewis
on Eminent Domain, section 158: "All the courts we
believe concur in holding that whether a particular

use is public or not within the meaning of the Con-
stitution is a question for the judiciary." If, there-
fore, the General Assembly should undertake to en-
act a statute giving to a private corporation, such as
a railroad, turnpike, or telegraph company, invested
with the power to exercise the right of eminent domain
or to a municipal corporation authority to take the
private property of an individual upon the payment
of compensation and deny to the courts the right to
say whether the taking was necessary for a public
purpose or not, we would not hesitate to declare so
much of the act as undertook to deprive the courts
of jurisdiction inoperative and void, upon the ground
that the Legislature could not take from the courts
the right to determine whether or not the property
proposed to be taken was needed for a public pur-
pose.  But municipalities and counties are agencies
and subdivisions of the state.  The streets, alleys, and
highways of a municipality are public places.  They
are under the exclusive control of the municipality.
And when the properly constituted authorities declare
that the necessities, welfare, comfort, and convenience
of the public demands that private property shall be
taken or that public ways shall be closed, the munici-
pality is merely exercising a public function, such as
the county courts exercise in the opening or closing
of public roads.  And it must be assumed that the
officers of the city as public agents will exercise with
wisdom and discretion the power lodged in their
hands.  They occupy towards the public a different
relation from the officers and agents of private corpo-
rations.  The latter it may be assumed are largely,
if not altogether, influenced in the acquisition of prop-
erty by the interest of the corporation they represent,
and are more concerned with the private affairs en-

trusted to their care than they are in the welfare of
the public. · Therefore, when a private corporation
desires to take private property, it must, if the matter
is put in issue, affirmatively show by evidence that
the property is needed for its use in the performance
of its duties to the public. On the other hand, when
a municipal corporation invested by the Legislature
with the power to close streets, alleys, and highways,
or to acquire property, undertakes to exercise the
power, the presumption will be indulged that it is in
the interest of and for the benefit of the public, and
that the proceeding is not for private or individual
use or advantage. And so, if a municipality ordains
that an alley or highway shall be closed, or a street
opened, it will be · presumed that it is done in the
interest of the public and necessary for public pur-
poses, and the burden of showing to the contrary will
be put upon the persons who object to the proceeding,
and the court should usually permit the defendants to
make the issue and present evidence in support of it.
But, in the case before us, it was so manifest from the
pleadings that the closing of the alley was in the
public interest that the court did not err in refusing
to permit an issue of fact to be made on this point.
A case might be presented where the court after hear-
ing the evidence would refuse to permit a munici-
pality to open, widen, or close a street, alley, or way
as if it was made to appear that the purpose was to
promote private ends and that the action was not in
the interests of the public. City of Louisville v.
Bannon, 99 Ky. 74, 35 S. W. 120, 18 Ky. Law Rep.
10. Lewis on Eminent Domain, section 134; 27 Am.
& Eng. Ency. of Law, p. 114. Nor is the act uncon-
stitutional because it seems to deny the right of the
courts to inquire into the question of public use by

failing to provide for the submission of this fact to the judiciary. We will not assume that the Legislature intended to take from the courts the consideration of this question. This is not our construction of the act. It was not essential to its validity that it should expressly stipulate that the question of public use was a matter to be judicially investigated and determined, and we hold that the act does not take from the courts the control of the subject.

It is also argued that the question of the necessity for the taking should be left to the decision of a judicial tribunal. But all the authorities agree that the question of necessity is distinct from the question of public use, and that the former question is exclusively with the Legislature. The necessity, expediency, or propriety of exercising the right of eminent domain for a public purpose, and the extent and manner of its exercise for such purpose, are questions of general public policy, and belong to the Legislative department of the government. Thus in Cooley's Constitutional Limitations, p. 663, it is said: "The authority to determine in any case whether it is needful to permit the exercise of this power must rest with the state itself; and the question is always one of strictly political character not requiring any hearing upon the facts or any judicial determination." And in Lewis on Eminent Domain it is laid down in section 238: "Whether the power of eminent domain shall be put in motion for any particular purpose, and whether the exigencies of the occasion and the public welfare require or justify its exercise, are questions which rest entirely with the Legislature. When the use is public, the necessity or expediency of appropriating any particular property is not the subject of judicial cognizance. The general principle is now

well settled that, when the uses are in fact public, the
necessity or expediency of taking private property
for such uses by the exercise of the power of eminent
domain, the instrumentalities to be used, and the ex-
tent to which such power shall be delegated are ques-
tions appertaining to the political and legislative
branches of the government." The meaning of this
is that the lawmaking department may invest munici-
pal and certain private corporations that perform
some public service with the right to take private
property, and the courts will not inquire into the
power of the Legislature to grant this authority. But,
when the corporation that is invested with this power
undertakes to exercise it, it is for the courts to say
whether it is exercised for a public purpose or not.
In other words, to determine whether or not the tak-
ing of the particular property the corporation desires
to condemn is necessary for a public use. To illus-
trate, a telegraph, telephone, or railroad company
might be invested by the General Assembly of the
state with the power to take private property of indi-
viduals for its use, and the courts would not assume
to say that the Legislature did not have the power
to grant to the corporation this authority; but, when
the corporation undertook to take private property,
then the courts would have the unquestioned right to
determine whether or not it was being taken for a
public purpose; that is, whether or not it was in fact
needed by the corporation in the performance of its
duties to the public, or whether it was being taken
for some other use not necessary in connection with
the operation and conduct of the corporation in the
performance of the duties it owed to the public.

The motives of the council in closing this alley are
also assailed, and the accusation is made that their

action was influenced by a desire to assist the railroad companies that wanted the freer and safer use of Water street. But we will not stop to inquire into the motives that prompted the council in the enactment of the ordinance in question. The record discloses that the only purpose they had was to subserve the public good. There is no evidence whatever indicating improper motive. But, aside from this, when the exercise of authority by a city council is within its power, the motives that influenced it will not be inquired into, except in rare cases, where it is manifest that a flagrant wrong had been perpetrated upon the public, and valuable rights have been surrendered ostensibly for the public good, but really for the benefit of private individuals. And the exceptional conditions that would authorize the courts to interfere are not in any manner presented by this record. Taylor v. Beckham, 108 Ky. 278, 56 S. W. 177, 49 L. R. A. 258, 94 Am. St. Rep. 357; Chicago & N. W. R. Co. v. Morehouse, 112 Wis. 1, 87 N. W. 849, 56 L. R. A. 240, 88 Am. St. Rep. 919; Waterloo M'fg. Co. v. Shanahan, 128 N. Y. 345, 28 N. E. 358, 14 L. R. A. 481; Ligare v. City of Chicago, 139 Ill. 46, 28 N. E. 934, 32 Am. St. Rep. 179; Farist Steel Co. v. City of Bridgeport, 60 Conn. 278, 22 Atl. 561, 13 L. R. A. 590; Smith v. McDowell, 148 Ill. 51, 35 N. E. 141, 22 L. R. A. 393; Van Witsen v. Gutman, 79 Md. 405, 29 Atl. 608, 24 L. R. A. 403; Horton v. Williams, 99 Mich. 423, 58 N. W. 369.

The mere fact that a corporation or an individual might be interested in or benefited by the taking of property will not of itself deny to the city the right to exercise the power. It is probable that in every case where the right of eminent domain is exercised private interests will be more or less benefited; but the exist-

ence of this fact will not be allowed to defeat the
benefits that will accrue to the public. The case before
us is an illustration. The railroad companies occupy-
ing Water street were benefited by the closing of this
alley. Its closure removed the liability of accidents
at the crossing, gave the companies freer use of Water
street, and diminished the cost and expense of dam-
age suits; but at the same time the erection of the
viaduct in connection with the closing of the alley
furnishes a safe and convenient passageway for the
public from Main to High streets, relieving travelers
of the dangers incident to the grade crossing of the
alley. So far as the general public are concerned,
there is no room to doubt that the closing of the alley
and the building of the viaduct was a benefit. The
only persons injured by the closing of the alley were
those whose property abutted on it between the streets
closed by its obstruction. And the mere fact that
the railroad companies were benefited and to secure
the benefit defrayed part of the expense incident to the
condemnation proceedings will not be sufficient to
defeat the right of the city to exercise its power to
take the property for the public good. Knapp v. City
of St. Louis, 153 Mo. 560, 55 S. W. 104; Vacation of
Union Street, 140 Pa. 525, 21 Atl. 406; Summerfield
v. Chicago, 197 Ill. 270, 64 N. E. 490.

The next question is: When the city undertakes to
close one of its highways, what persons are necessary
parties to the proceeding? The streets and highways
of a city are for the use of the public, but this does
not mean that the entire public of the city must be
consulted before any particular highway or part
thereof is closed, or that all property holders in the
city shall be made parties to the action or receive
compensation. If this was necessary, it would be im-

practicable to close any street, alley, or highway, or
any part thereof, however essential to the comfort,
convenience, and health of the city the closing might
be.    Thus it is said in Transylvania University v.
City of Lexington, 3 B. Mon. 25, 38 Am. Dec. 173:
"Every owner of ground on any street in Lexington
has a right, as inviolable as it is indisputable, to the
common and unobstructed use of the contiguous high-
way, so far as it may be necessary for affording him
certain incidental easements and services, and for a
convenient outlet to other streets.  *  *  *  The extent
of this appurtenant right, depending on circumstances,
may not in a particular case be easily definable with
mathematical precision.  *  *  *  But it cannot, as to
each proprietor of ground, be coextensive with all
the streets and alleys of the city.  As a private right,
it must, like that of vicinage, be limited by its own
nature and end; that is, chiefly by the necessity of
convenient access to, and outlet from, the ground of
each proprietor.    Beyond some such general limit, as
to each proprietor of ground in the city, the streets
are altogether public highways, and subject, like
other public roads, to alteration and even occlusion
by the sovereign will for the common weal.    We could
not admit that there is no power to change any por-
tion of a street in any part of the city without the
consent of every proprietor of ground in the whole
city, or without making compensation in money to
every such proprietor."    It is, however, difficult to
determine with fairness to the public, as well as the
private owner, what property owners are so interested
in the street, alley, or highway proposed to be closed
as to render it necessary that they should be parties
to the action.    But our conclusion upon this question
is that the only persons who are entitled to compensa-

tion and are necessary parties to the proceeding are those whose property abuts upon or adjoins the street, alley, or highway proposed to be closed. We do not mean by this to limit the property owner entitled to compensation or who are necessary parties to the action to those who own property immediately at the point of closure, but that it should embrace all persons and all property abutting upon the street proposed to be closed. To illustrate, if it is desired to close a portion of the street, or the entire street known as A., between B. and C. streets, then all the persons owning property upon A. street between B. and C. streets are necessary parties to the action, and entitled to compensation. So that in the case before us, as it was proposed to close a part of Ayres alley between High and Main streets, all persons who owned property abutting on either side of Ayres alley between High and Main streets were necessary parties to the action and entitled to compensation. But owners of property abutting on Main or High streets not adjoining the alley were not necessary parties or entitled to compensation because the closing of the alley did not, except indirectly, interfere with the right of ingress or egress to or from their property. In cases of this character, if it should be laid down that persons who own property not abutting on the street or alley intended to be closed as herein indicated were necessary parties or entitled to compensation, it would be difficult, if not wholly impracticable, to select the persons who should be made parties and who were entitled to compensation. Property owners on adjoining streets or squares might with a show of reason and evidence assert that their property was damaged by the closing, although they had ample access and outlet through other streets. Therefore the equitable

and practicable rule is to limit the persons entitled
to compensation, and to be made parties to the prop-
erty owners abutting on the street, alley or highway
proposed to be closed between the nearest streets inter-
sected by the street, alley, or highway to be closed.
Although if a case was presented in which it was made
plain that there was a fraudulent arrangement be-
tween these property owners and the city to close the
highway, not in the interest of the public, but for
private ends, the court might permit in the interest of
the public some other property owner not entitled to
compensation to come in and resist the closing.

It is further insisted that, as Ayres alley was con-
veyed to and accepted by the city under a deed pro-
viding that "it shall always remain free and open as
a public street or alley," the city had no power to
close it in violation of the express conditions under
which it was accepted.   This argument, if sound,
would in many instances impose upon municipalities
unnecessary and unreasonable burdens. If a street of
highway dedicated to a city should cease to be either
useful or convenient for the public, and yet the city
be obliged to keep it open and maintain it in sufficient
repair, it would be imposing upon the public a useless
expense; and to so hold would be opposed to both
reason and public policy.   In our opinion the correct
doctrine is that the city has the same control over
highways deeded to it as was Ayres alley that it does
over its other public ways, whether acquired by gift,
purchase, or condemnation.   In short, all the streets
and public ways of a city, however acquired, are sub-
ject equally and alike to the control and regulation
of the municipal authorities.   In accepting the alley
under the conveyance, the city did not bind itself
irrevocably to keep it open.   This is not the fair

meaning of the contract. The city assumed the duty of keeping it open as other streets and alleys were kept open, and the right to close it as it might close other streets and alleys.

The city made all of the appellants defendants to the action to close the alley, insisting that the damages to which each of them was entitled should be assessed by the same jury and determined in the same proceeding. The appellants objected to this procedure, and demanded that they be awarded separate trials. The matter of allowing separate trials in cases of this character is largely in the discretion of the trial judge, and his discretion we would not feel authorized to interfere with unless it worked serious injustice to some of the defendants. The action of the trial court in the case before us was not an abuse of discretion, and seems to be in accordance with the provisions of the act, which declares that all the necessary parties shall be made defendants to the action, and contemplates that the damages to be assessed shall be determined in one trial. But, aside from this, there were only three parties defendant. The amount of damages to which each one of them was entitled could as well be assessed by a single jury as in separate trials before different juries. The question involved as to each of them was identically the same; the only difference being that one might be entitled to recover more damages than the other. Separate trials would have involved the consideration by the jury of every question of fact developed upon this trial except that relating to the damages to the particular property of each individual. So that the time of the court would have been taken up in the hearing of three cases in which the same identical question was involved, except as to the amount of damages to

be awarded to each.    7 Ency. of Pl. & Pr. p. 503; Washburn v. Milwaukee R. Co., 59 Wis. 379, 18 N. W. 431; McKee v. St. Louis, 17 Mo. 184; Colcough v. Nashville R. Co., 2 Head (Tenn.) 171.

It is also complained that numerous errors were committed in the admission and rejection of evidence, and instructing the jury as to the measure of damages. An examination of the record discloses that the evidence was allowed to take a wide range, and every material fact necessary to enable the jury to properly understand and assess the amount of recovery to which each of the appellants was entitled was brought out. Accepting as correct expositions of the law the instructions given by the court, the jury could not have failed to understand those facts in the case necessary to enable them to properly estimate the damages in accordance with the instructions. The court instructed the jury that: "If they believed from the evidence that either of said property holders will be damaged by closing of Ayres alley, the jury should say in their verdict what sum of money will compensate the said property holder for such damages. In estimating the damage done to each property holder, the jury will consider the value to the property owner of the property abutting on said alley and belonging to such property holder, and, if said property is of less value to the property holder by reason of the closing of Ayres alley than it would be if said alley were left open, the difference of value to the property holder of the property as it now is and its value as it will be when said alley is closed is the measure of damage done to the property holder by reason of the closing of said alley." This instruction was more favorable to the property owners than they had the right to demand. They were entitled to the difference

in the market value of the property with the alley
open and its market value with the alley closed.
Whereas, in the instruction given, the jury were
authorized to find the damage to be the difference in
the value of the property to the property owner before
and after the alley was closed. The value of the
property to the property owner might in some in-
stances be a great deal more than its market value and
in others less. In estimating and assessing the dam-
ages under the instruction, the jury had the right to
and may have taken into consideration the personal
and individual inconvenience and loss from a business
standpoint that the property owner sustained. The
measure of damage to which the property holder is
entitled in cases of this character does not include loss
occasioned by injury to his business. He is only entit-
led to compensation for loss sustained to his proper-
ty, and this loss is the difference in the market value
of the property. Any other criterion of damages would
enter the field of speculation, and make the loss in-
capable of reasonable ascertainment. The market
value of a thing is generally the best evidence of its
worth—the fairest standard of its value. The indi-
vidual whose property is taken might not be willing to
surrender it for three times its market value. To him
it might be associated with sentimental notions that
would enlarge its value far beyond the real and sub-
stantial. Again, the owner may have established a
business in a particular place or building that was
more valuable to him than it would be to any one else,
and as a consequence the property would have a value
to him far above its market value. But these evid-
dences or elements of value are the best of personal
or individual preference and effort. They affect the
individual more than they do the property, and, if al-

lowed to enter into or control the damage,it would be virtually impossible to estimate or fix with reasonable certainty the real value of the property. It must be admitted that, when the standard by which the loss is to be measured is fixed at the market value of the property, the owner in some cases will not secure what is to him its fair value, but on the other hand, the purchaser ought not to be required to pay more than the fair market value for any property that the law gives him the right to take upon the payment of just compensation, and, when the owner has recovered this price, he will generally get what he is entitled to. There is some apparent conflict in the cases on this subject largely attributable to the different states of fact presented, but in Madisonville, Hartford & E. R. Co. v. Ross, 103 S. W. 330, 31 Ky. Law Rep. 584, City of Louisville v. Hegan, 49 S. W. 532, 20 Ky. Law Rep. 1532, and L. & N. R. Co. v. Cumnock, 77 S. W. 933, 25 Ky. Law Rep. 1330, the rule we have announced is fully sustained. It is also the one approved in Lewis on Eminent Domain, section 463; Dillon on Municipal Corporations, section 623; Elliott on Streets, section 271; 15 Cyc. 701; 10 Am. & Eng. Ency. of Law, p. 1151. In disposing of this question, we have not deemed it pertinent to the subject in hand to discuss the range the evidence may take in elucidating what is the market value of the property proposed to be taken. No fixed rule of universal application can be laid down. The relevancy and competency of evidence must be left to be controlled by the facts of each case as it comes up. But generally all of the facts as to the condition of the property, its surroundings, improvements, and capabilities may be shown. A full discussion of this subject will

be found in Lewis on Eminent Domain, sections 478, 479; Elliott on Streets and Roads, section 260. In the case before us the injury was to the whole property. None of it was, accurately speaking, taken. The only injury consisted in depriving the property of the full use of an adjacent alley; and, while this was in the meaning of the Constitution a taking, yet the damage done was susceptible of being fairly estimated upon the basis of the injury done to the market value of the property. And what we have said upon this point must be accepted as our understanding of the law controlling cases presenting questions like the one under consideration.

The court further instructed the jury that: "The right at present exists in the property owners on Ayres alley, as well as in all citizens of the city of Lexington, to use as a public highway the land adjoining Ayres alley, as originally constructed, on the west side, and being north of Water street, and lying under the viaduct, and being opposite W. H. Henderson's property, but this right on the part of each and every citizen is subordinate to the superior right of the Lexington Union Station to use said land for the purpose of its business as it may desire." The land mentioned in this instruction is indicated on the map by the words "vacant space under viaduct." To understand why this instruction was given, it will be necessary to relate briefly the situation of this space and the conditions under which it exists. Henderson's property runs back with the alley and on the east side thereof to Water street. Under the viaduct at Water street, there is an open space some 70 feet long and about 30 feet wide, in which wagons and other vehicles can go from the alley. This open space is immediately across the alley from Hender-

son's building, and teams going down the alley from Main street to Henderson's building can unload, and go in the space under the viaduct, there turn around, and go out the alley to Main street. While it is a fact that vehicles going in the Main street mouth of the alley cannot cross Water street, they can be driven as far as Water street and turn around in the space under the viaduct, and go out the way they came in. Before the alley was closed, vehicles coming from Main street could not be turned in it, but had to go out to either Water street or High street. It will thus be seen that the open space under the viaduct was a benefit to Henderson's property, and in a large measure compensated him for the obstruction of the alley. Admitting this to be true, the argument is made that Henderson's use of the vacant space under the viaduct is limited so as to impair if not destroy its value to his property, and hence the court should not have instructed the jury upon this point. This argument is rested upon the ground that under the contract between the city and the railroads it is provided that the railroad companies, or rather the Lexington Union Station Company standing in their place shall be allowed to use in perpetuity so much of this space as it may desire for its purposes, and that the right of Henderson or persons doing business at his building to its use may be at any time taken away or so curtailed as to render the use of little importance. That the giving of this instruction exercised a weighty influence upon the jury in estimating the damage to the property of Henderson by closing the alley we have no doubt. And if the right of the public as well as property owners in Ayres alley to use this space in common with other citizens could be taken away, or so curtailed as to render it

valueless, there would be great force in the contention of counsel for the appellants that the instruction upon this subject was misleading and prejudicial. But neither the railroad companies nor the Union Station Company will be permitted to deny to the public or any individual the use of this space as a public highway; and the public generally may use and occupy it upon equal terms with its use by the Lexington Union Station for the purposes of its business, and this use by the Lexington Union Station Company must be a reasonable and a necessary use. It cannot arbitrarily exclude the public from or unnecessarily obstruct their use of this space.

It is also contended that the verdict of the jury is grossly inadequate, but we will not extend this opinion in discussing this question. The amount of damage was a matter entirely within the discretion of the jury. They were doubtless familiar with the location of the property, and the injury to its value that resulted from closing the alley. They saw and heard the witnesses testify, and their finding of the amount of damages will not, as we have frequently announced, be disturbed, as it was not so inadequate as to indicate that the conclusion was the result of passion or prejudice.

After a careful consideration of all the material questions presented by the record, we have reached the conclusion that the judgment should be affirmed; and it is so ordered.