COMMONWEALTH of Kentucky, DEPARTMENT OF HIGHWAYS, Appellant,

v.

Lewis B. SHERROD et al., Appellees.

Court of Appeals of Kentucky.

March 22, 1963.

John Breckinridge, Atty. Gen., H. D. Reed, Jr., Asst. Atty. Gen., James B. Stewart, Leslie D. Aberson, Dept. of Highways, Frankfort, for appellant.

Denney & Landrum, James M. Todd, Lasserre Bradley, Lexington, for appellees.

CULLEN, Commissioner.

This is an eminent domain case, involving the taking of a strip for highway widening purposes from the front of a tract of land, a portion of which tract was under lease for commercial use. The appeal is by the Commonwealth from a judgment awarding the landowners $31,075 and the lessees $41,215.

The landowners owned a 12-acre tract just outside the city limits of Lexington, having a 450-foot frontage on U. S. Highway No. 68. In approximately the center of the front part of the tract there was a parcel with a frontage of 150 feet and a depth of 250 feet on which there were a restaurant building and related structures, primarily designed for drive-in trade but with some space for inside customers. This parcel was leased for a period which, at the option of the lessees, could run to 1975 (the condemnation suit was tried in 1960). The remainder of the tract had no structures on it

other than a residence and farm outbuildings near the back of the tract. The frontage north of the restaurant parcel was level with the road, but the frontage south of the restaurant parcel was in the form of a wide gully, around 10 feet below the level of the road, which extended back several hundred feet.

For the purpose of converting the existing two-lane highway into a four-lane highway the state condemned a strip averaging 23 feet in depth along the entire frontage. This embraced some of the parking spaces on the restaurant parcel. In addition, for the purpose of building a culvert and changing the drainage courses, the state condemned an additional 30 feet from the frontage of the gully parcel.

The verdict awarded the landowners $1,750 for the land taken from the gully parcel, $750 for the land taken from the frontage north of the restaurant parcel, $5,175 for land taken from the restaurant parcel, $23,250 for resulting damages to the gully parcel, and $150 for use of a temporary construction easement. The verdict awarded the lessees $28,350 as damages for the portion of the leasehold taken, $4,150 as resulting damages to the leasehold interest, $215 for use of a temporary easement, and $8,500 for loss of business during the highway construction period.

We are reversing the judgment because of error in the instructions (other errors also warranting reversal will be discussed at a later point in this opinion). We find the following errors in the instructions: *First,* the instructions do not state anywhere that the total damages cannot exceed the difference in the value of the entire tract before and after the taking, or that the *measure* of damages is such difference. They do say in one place that the total damages to the *landowners* cannot exceed the difference in the value of the entire tract before and after the taking, but this puts too high a ceiling on the total damages to the landowners because the difference in value of the entire tract would embrace damage to the *lessees.* *Second,* the instructions, which included interrogatories and blank spaces for filling in amounts of awards, were so confusing, overlapping and contradictory that when the verdict was brought in neither the judge nor any of the parties could understand it, and the judge was required to question the jurors orally in order to determine what the verdict meant. *Third,* the instructions authorized (and in fact directed) the jury to add together various items of damages to the landowners and to the lessees instead of directing the jury to determine first the damage to the tract as a whole and then apportion that amount between the landowners and the lessees. See Korfhage v. Commonwealth, Ky., 296 S.W.2d 476; City of Ashland v. Price, Ky., 318 S.W.2d 861. *Fourth,* the instructions gave no basis at all on which the jury could determine the damages to the *landowners* from the taking of a portion of the restaurant parcel, except that the instructions carried a vague implication that the landowners could be awarded the *full* value of the land taken and the lessees could be awarded damages to the leasehold on top of that. *Fifth,* the instructions stated that the measure of damages for the taking of the leasehold is the difference between the fair monthly rental value of the property immediately before the taking and immediately after the taking, multiplied by the number of months remaining in the lease, *plus other direct damage to the leasehold.* Aside from the fact that this would permit double recovery, it is a distortion and wholly incorrect application of the rule stated in the Ashland case, supra, which is that in order to determine the lease value *before the taking,* the difference between the fair rental value and the *actual rent being paid* is to be ascertained. *Sixth,* the instructions told the jury they could consider the "value" of the property *to the lessees* "in the operation of the business of a drive-in restaurant." On no basis can this be considered a proper element of damage; not only does it get into the forbidden *profit* area but it invokes improper consideration of value to

the particular owner as distinguished from fair market value. *Seventh,* the instructions authorized recovery of damages by the lessees for "reduction in entrance and exit," which for reasons hereinafter discussed were not properly allowable. *Eighth,* the instructions authorized recovery by the lessees for loss of profits during the construction period. (The reasons why such a recovery cannot be had are discussed at a later point in this opinion.)

The Commonwealth did not in its objections to the instructions specifically pinpoint all of the errors we have noted above; however, some of the Commonwealth's objections were well taken, and when the objections are considered with the theory of the case presented in the Commonwealth's offered instructions we think the Commonwealth sufficiently raised the question of error in the instructions.

While we are reversing the judgment because of failure of the trial court to observe the existing rules of law in this jurisdiction applicable to eminent domain cases, we have decided to reexamine those rules, abolish some of them, and state new rules that will govern in the event of another trial of this case, and will have application in other cases as stated at the end of this opinion.

## DETERMINATION AND ALLOCATION OF DAMAGES FOR LEASED PROPERTY

As related to the leased parcel, and the determination of the respective damages of the landowners and the lessees, the evidence in this case was directed in a loose way towards application of the method outlined in City of Ashland v. Price, Ky., 318 S.W.2d 861. The key to this method is "to ascertain the present fair rental value, compare it with the rent stipulated in the contract and allow the aggregate difference for the period of the unexpired term of the lease" (318 S.W.2d 863).

Aside from the fact that the foregoing method furnishes no criterion or basis for determining the lessee's damages where only *part* and *not all* of the leased property is taken, we have come to the conclusion after thorough reconsideration that the method is completely unsound, unfair and unworkable.

Let us use an illustration that is not far afield from the actual facts of this case: The property as a whole, if sold free and clear of the lease, would have a value of $100,000. The fair rental value would be $12,000 per year (there is testimony in this case that 12% rent is fair for commercial property). The lessees have contracted to pay only $6,000 per year. Their lease has 20 years to run. The state condemns the entire tract. By applying the method outlined in the Ashland case, the lessees would be damaged $120,000 ($6,000 per year for 20 years) or $20,000 more than the whole property was worth. This is so patently absurd as to establish beyond any question the fallaciousness of the method. The foregoing illustration is not at all inappropriate because in the instant case the lessees were paying $7,200 a year rent; they said the fair rental was $14,400 a year; their lease had 15 years to run; therefore their damage was $108,000. Yet they testified that the leased property as a whole was worth only $120,000 (one said it was worth only $105,000) and the state took less than one-fourth of the area and none of the structures.

We think that this Court was led into acceptance of the method advanced in the Ashland case by a failure to adhere to the basic touchstone of property damage measurement, namely, *fair market value,* and by a mistaken, vague idea that somehow a lease interest can be damaged more than outright fee interest.

As concerns the latter proposition, it would seem obvious that if *25%* of the *market value* of property worth $100,000 is taken away from the fee owner, his damages can not exceed $25,000. If, then, the property is leased, how can the total damages rise above $25,000?

There seems to be some idea that the lessee is entitled to compensation for the "intrinsic" value of his lease, or for loss of *business* values, or for damages to the particular kind of business operation he is carrying on. The opinion in the Ashland case so indicates. But the *landowner* himself is not entitled to loss of profits, Newport Municipal Housing Commission v. Turner Advertising Co., Ky., 334 S.W.2d 767. Nor is he entitled to any loss attributable to impairment of the particular business he has chosen to carry on; he is limited to loss of *market value*. For example, if the owner of land is carrying on a restaurant business and the state condemns such portion of the land as to make it no longer suitable for restaurant purposes, he cannot claim damages for loss of his restaurant business—he can claim only the depreciation in market value of the tract. See Commonwealth Dept. of Highways v. Smith, Ky., 358 S.W. 2d 487. There is no reason why the same rule should not apply to *leased* property. If the condemnation taking makes the property unsuitable for the particular business of the lessee, the lease may still have market value for some other purpose, so the lessee has lost only the difference between the former market value of his lease and the after market value.

Some of the confusion seems to have arisen from the idea that leases ordinarily are not bought and sold, and therefore their market value is not ascertainable. We are not sure that this idea is correct, because many kinds of commercial leases are sold, but regardless of that, *property* often is sold *subject to a lease,* so the market value of the lease can easily be ascertained by determining what the whole property would sell for free of the lease, and what it would sell for subject to the lease—the difference is the value of the lease. (Of course, if the lease were disadvantageous to the lessee it would have no value, because the land would not sell for less subject to the lease, but for *more*.)

At this point we deem it necessary to warn against a possible misinterpretation of the opinion in Korfhage v. Commonwealth, Ky., 296 S.W.2d 476. It is that in valuing the property as a whole, as if in unqualified fee ownership, an actual existing lease should be considered as an element of the value of the land. That such is not the rule is shown by the quotation in that opinion from 2 Lewis on Eminent Domain (3rd Ed.), Sec. 716, p. 1253:

"When there are different interests or estates in the property the proper course is to ascertain the entire compensation *as though the property belonged to one person* and then apportion this sum among the different parties according to their respective rights. *The value of the property cannot be enhanced by any distribution of the title or estate among different persons or any contract arrangements among the owners of different interests.* Whatever advantage is secured by one interest must be taken from another, and the sum of all the parts cannot exceed the whole." (Our emphasis)

Under the quoted rule we think that if the owner of land has negotiated a lease that is advantageous to him (at a rental higher than the fair rental value), and therefore the property would sell for more than its normal market value, the excess over the normal market value must be considered a *profit* for which he is not entitled to be compensated in condemnation proceedings. He must be restricted in recovery to fair market value of the fee; otherwise he is being allowed to enhance the value of the property by distribution of the title among different persons.

A comparable situation would be where the owner of land had *contracted* to *sell* the land to another person for *more* than its fair market value. If he were held entitled to damages based on the sale price the anomalous situation would be pre-

sented of his being compensated on that basis, but if the land were condemned from the buyer the latter could be compensated only on the fair market value. It is our opinion that strict adherence must be had to the fair market value measure of damages in condemnation, regardless of any contracts affecting the amount of profit a particular person might realize from the property.

■ Returning to the question of apportionment of damages between the landowner and the lessee, we find that other courts have recognized that the proper *measure* for determining damages to a leasehold interest in condemnation proceedings is the difference in the *fair market value* of the leasehold before and after the taking. But because they have felt that the fair market value is difficult or impossible to ascertain they have invoked all kinds of formulas and theories in an effort to find an *equivalent* of fair market value or to reach "equitable" results. See Annotation, 3 A.L.R.2d 286. As hereinbefore indicated, however, we think that the fair market value of the leasehold (if any) can be ascertained by simply subtracting the fair market value of the land as a whole if sold subject to the lease, from the fair market value of the land as a whole if sold free and clear of the lease. We also think that any departure from this strict rule of fair market value can result only in hopeless confusion.

After thorough deliberation we have worked out what we consider to be the most reasonably fair and workable method for determining compensation in cases of condemnation of property that is under lease. Under this method the proof should be directed towards showing, and the instructions should require the jury to find, only the following three values:

A. The fair market value of the leased tract as a whole immediately before the taking, giving consideration to the fact that it has rental value but *evaluating it as if free and clear of the lease.* (This will be factor *A*.)

B. The fair market value of the leased tract as a whole, immediately before the taking, *if sold subject to the existing lease.* (This will be factor *B*.)

C. The fair market value of so much of the leased tract as remains immediately after the taking, giving consideration to the fact that it has rental value but evaluating it as if free and clear of the lease. (This will be factor *C*.) (Of course, if the entire tract is taken by the condemnation, this value will be zero and need not be found by the jury, but for the purpose of the following computations *C* will be considered to be zero.)

After the jury has fixed the foregoing three values the *judge* will compute and apportion the damages as follows:

(1) Subtract *C* from *A*. The result is the total damages payable by the condemnor.

(2) If *B* is the *same* as or *more* than *A*, ignore *B*. In this situation *all* of the damages will go the *landowner*, because the leasehold had no value, by reason of the fact that the existence of the lease has not impaired the market value of the tract.

(3) If *B* is *less* than *A*, subtract *B* from *A*, and then *divide* the difference by *A*. The result will be the *percentage of ownership interest* the *lessee* is deemed to have had in the leased tract before the condemnation.

(4) *Multiply* the total damages, found under (1) above, by the percentage found under (3) above. The result will be the *lessee's* share of the total damages. Subtracting his share from the total damages will leave the *landowner's* share.

It is proper for the foregoing computations to be made by the judge because they involve only mathematical computations and not a determination of disputed facts. It would confuse the jury to require them to make the computations.

We believe the foregoing method is fair because it fixes a market value on the lease and then gives the lessee damages in the

same proportion that the entire property is damaged. As pointed out by Nichols, "The award stands in the place of the land and the owners of each interest may recover out of the award the same proportionate interest which they had in the land condemned." 4 Nichols on Eminent Domain, Sec. 12.42, p. 290. The method of course is based on the assumption that the lease value depreciates in the same ratio as the sale value of the entire property, which we feel is a legitimate assumption when it is considered that a commonly accepted method of determining property values is by capitalizing rental values. It is true that the lease value *to the particular lessee for his special purposes* might depreciate more, but the lessee can protect himself against loss from that factor by assigning the lease to someone who will rent the property for a different use.

The method is fair because if the lessee is compensated for the percentage of interest he had in the property taken, by virtue of his advantageous lease, he still retains the same percentage of interest in the remaining tract, which presumably he can realize upon by assigning his lease.

Under our view it is immaterial whether the lessee, after the condemnation, will be allowed a reduction in rent in proportion to the reduction in total value of the leased tract, or will be required to continue to pay the originally agreed rent, or will have the privilege of surrendering his lease and being relieved to rent entirely. By virtue of the condemnation, the lessee who originally had an advantage (or the equivalent of an interest in the property) by reason of a favorable rental price, will lose that advantage in the same percentage that the whole value of the leased tract is reduced, whether or not he is allowed a reduction in rent. If by operation of law or by special terms of his contract he is required to continue to pay the same rent *he loses more* (as between him and the landowner but not as between him and the condemnor), but to give him a *larger share* of the damages paid by the condemnor would be in effect to relieve him in part from his obligation to the landowner

to pay full rent; therefore, it would be improper to give him a larger share. If the lessee exercises a privilege to surrender the lease and be relieved of rent entirely, the result will be that he has lost *all* of the original advantage he had from his favorable lease, instead of only a portion of such advantage, but the extra loss is due to his *election* to surrender the lease and not to the condemnation. (Presumably he could assign his lease, for a consideration, to another person who would have a use for the property in its changed condition, and thus avoid the extra loss.) The *landowner* cannot be damaged more in such a situation, because he has been freed of a lease that was *disadvantageous* to him.

Whether as a matter of law a lessee, after condemnation of *part* of the leased tract, should be allowed a proportionate reduction in rent is a matter we need not decide. However, see 32 Am.Jur., Landlord and Tenant, Sec. 492, p. 493; Annotations, 43 A.L.R. 1182, 3 A.L.R.2d 330; 1 Orgel on Valuation Under Eminent Domain, Second Ed., Sec. 121, p. 522.

We are dealing in the instant case with a short-term lease involving property the buildings on which were constructed by the landowner. However, we see no reason why the method or formula we have outlined would not work in case of a long-term (99-year) lease, or in a case where the lessee constructed a building which at the end of the lease term would revert to the landowner. (In the latter case the lessee would be paying a much lower rent than if the landowner had constructed the building, so the lessee's *advantage* would be great in applying the formula.) Special complications might arise in a case where the lessee erected structures on the land which by express provisions of the lease he was entitled to remove at the end of the term, but we believe those complications could be met by requiring such structures to be valued separately from the land.

As a final word on this phase of the case we say that in applying the formula in the

instant case the restaurant parcel should be treated as in independent tract, separate and apart from the remainder of the 12-acre tract. This is because the application of the formula would be confusing if the leased land and the land not leased were treated as a single unit.

## SEPARATION OF TAKING AND RESULTING DAMAGES

It will be noticed that the method or formula hereinbefore outlined makes on provision for separately determining and stating the *taking* damages and the *resulting* damages. The omission is intentional. There could be several reasons for not making such a determination in cases involving *leased* property, one of which might be that attempts to separate *taking* damage to a lease interest from *resulting* damages to such interest almost inevitably will result in confusion, as illustrated by the verdict in the instant case which allowed the *lessees* $28,350 as damages for the portion of the leased property taken while allowing the *landowners* only $5,175 for that portion, and which awarded the lessees $4,150 as resulting damages whereas under the evidence *all* of the damages claimed by the lessees were really resulting damages. However, the conclusion we have reached, for the reasons hereinafter set forth, is that there should be no separate determination and fixing of *taking* and *resulting* damages in *any* condemnation case, whether involving leased property or not.

For a great many years the *railroad* condemnation statutes have required the commissioners in the county court, and the jury in circuit court, to determine and fix separately the *taking* damages and the *resulting* damages. KRS 416.020, 416.050. The *highway* condemnation statute makes such requirement of the commissioners in county court but not of the jury in circuit court. KRS 177.083, 177.087. However, it seems to have been assumed by the bar and the bench that the requirement does apply to juries in circuit court in highway condemnation cases.

The requirement in the railroad law was made by the legislature at least as early as 1882, prior to the adoption of Section 242 of the present constitution. See Asher v. Louisville & N. R. Co., 87 Ky. 391, 8 S.W. 854. However, since the *measure* of damages where part of a tract of land is taken has always been the difference in market value of the tract before and after the taking (it being so held as early as Elizabethtown & Paducah R. Co. v. Helm, 8 Bush 681) there never was a reason to require a separate fixing of *taking* and *resulting* damages, except possibly as it might involve questions relating to the *offsetting of benefits*. But it appears that Kentucky has never followed the rule prevailing in some states (see 18 Am.Jur., Eminent Domain, Sec. 301, p. 946) that benefits may be set off against *resulting* damages but not against *taking* damages. The opinion in Broadway Coal Mining Co. v. Smith, 136 Ky. 725, 125 S.W. 157, 26 L.R.A.,N.S., 565, referring to decisions prior to the present Constitution, not only shows that Kentucky never permitted offsetting of benefits against damages under former Constitutions (except as to an illusory category of "consequential injury and inconvenience" —about which we shall have more to say later), but it states unequivocally that under the present Constitution, particularly Section 242, there can be no offsetting of benefits against damages.

Not only is there no discernible reason for a separate determination of *taking* damages and *resulting* damages, but in our opinion to require or permit the jury to make such a determination results in the use by the jury of approaches to the question of damages that depart from the true *measure* of damages (difference in market value) and which are not valid and sometimes are completely artificial. As to *taking* damages, it causes the jury to attempt to put sale values on things that are never sold voluntarily, such as a 50-foot strip across the front of a farm, or, as in the instant case, a 25-foot strip across the front of a drive-in restaurant. As to *resulting*

damages, it results in valuations based on *costs of restoration* or on vague considerations of the *harm* that has been done to the particular owner in his particular use of the property.

It appears that much of the trouble that has arisen in our condemnation cases has resulted from an attempt by this Court to compromise the true measure of damages (difference in market value) with the prescribed or assumed statutory requirement that the jury separately determine and state the *taking* damages and the *resulting* damages. The compromise has taken the form of prescribed instructions to the jury that the measure of damages is the difference in market value, but that the jury shall separately fix the *taking* damages and the *resulting* damages, the total of which shall not exceed the difference in market value. See Commonwealth v. Combs, 244 Ky. 204, 50 S.W.2d 497; Kentucky Water Service Co. v. Bird, Ky., 239 S.W.2d 66. The trouble with this is that *it does not require the jury to fix the difference in market value.* Verdicts simply stating the *taking* damages and the *resulting* damages have been accepted and upheld if the total allowance did not exceed the highest credible *evidence* of difference in market value. We think this is completely unsound, because the court cannot know what the jury really thought was the difference in market value. It seems clear that the difference in market value is *a fact that must be found by the jury,* and verdicts making separate awards for *taking* damages and *resulting* damages should not have been upheld simply because the total did not exceed what the jury *could* have found was the difference in market value. The simple fact is that the jury is not going to govern itself by the proper measure of damages unless the jury is required to return a verdict specifically applying that measure.

Orgel points out that attempts to separate *taking* damages from *resulting* damages, particularly where the courts have said (as this Court has said) that the land *taken* must be valued *as a part of or in relation to the whole tract,* result in the finding of nonexistent values and in the *duplication* of damages. Further, the attempted separation is based on the fallacy that the value of a whole can be spread out and apportioned. He says:

"This fallacy may be avoided in the partial-taking cases, however, for a way out of the difficulty is open, namely, the abandonment of the attempt to find the separate value of the part taken, in favor of the rule that recovery should be based on the difference between the value of the whole before and after the taking. The adoption by all courts of this rule should be far less confusing to a jury and would probably avoid a very practical objection that may be urged against the more popular rule of 'value of the part taken plus damages to remainder'— the objection that a jury may include in 'damages to the remainder' a part of the very injury which it incorporates in 'value of the part taken'." 1 Orgel, Valuation Under Eminent Domain, Sec. 52, p. 238.

Orgel further states that the "before and after" rule is the only *logical* rule and that the rule requiring separation of *taking* damages and *resulting* damages is based upon "artificial dichotomy." 1 Orgel, Valuation Under Eminent Domain, Sec. 51, p. 236. Also, he explains how adherence to the "before and after" rule would eliminate problems arising from claims that taking of "frontage" should be specially compensated for even though the landowner, after the condemnation, will still have the same amount of frontage. 1 Orgel, Valuation Under Eminent Domain, Sec. 64, p. 296.

Nichols says: * * * "the simplicity of the application of the before and after rule commends itself to the courts as the method most likely to attain a result that is fair both to the condemnor and the condemnee." 4 Nichols on Eminent Domain, Sec. 14.232(1), p. 555.

■ Our considered conclusion is that the jury should not be required, or even permitted, to fix separately the *taking* damages and the *resulting* damages. The true basis for this conclusion is that there really are not any such things as *taking* damages and *resulting* damages. The only damage is the difference in market value before and after the taking, and that is the only issue to be submitted to the jury. (We exclude such things as temporary construction easements, which are in a separate category.)

■ This conclusion does not mean that evidence may not be introduced as to various factors that will reduce the value of the remaining land. But these factors are merely to be considered as they may affect the difference in market value before and after the taking. See Greenup County v. Redmond, Ky., 335 S.W.2d 335. Evidence of factors bearing on diminution of value should be addressed to how they will *affect market value* and not how they will *hurt* the owner or make less advantageous the use of the property for his particular purposes, or create conditions that he would *like* to remedy. And no *price* should be put on the individual factors. Commonwealth Dept. of Highways v. Stamper, Ky., 345 S.W.2d 640; Commonwealth, Dept. of Highways v. Tyree, Ky., 365 S.W.2d 472 (decided March 1, 1963).

■ We consider that the *form* of the verdict in condemnation cases is a matter of *procedure* and not of substantive law. Under Chapter 18 of the Acts of 1952 (KRS 447.154, 447.156) the legislature has recognized the supreme authority of this Court in the field of judicial procedure. Accordingly, the statutory requirement in the railroad condemnation law that the jury in circuit court shall separately fix the *taking* and *resulting* damages (there is no such express requirement in the highway condemnation law) must yield to the determination of this Court, here made, that such is improper procedure. Furthermore, it is our opinion that the statutory requirement

tends to produce verdicts awarding more than "just" compensation and thus is in violation of Sections 13 and 242 of the Constitution, which are designed to protect the condemnor as well as the condemnee. See Chesapeake & O. Canal Co. v. Key, 3 Cranch, C.C. 559, Fed.Cas.No.2,649, where Chief Justice Cranch said: "Just compensation means a compensation that would be just in regard to the public, as well as in regard to the individual; * * *".

## FENCING

■ While we are on the subject of the form of the verdict we deem it proper to say that there is no valid reason for perpetuating the old rule that *fencing* is to be handled as a separate item. We recognized in Greenup County v. Redmond, Ky., 335 S.W.2d 335, that there is no *logical* basis for such a rule, but decided to continue to recognize it by reason of its long period of existence, growing out of early railroad condemnation statutes. Under the rule promulgated in this opinion, that only before and after values are to be considered, there is no place for a separate allowance for fencing. Certainly the landowner is not entitled to fencing costs on top of an allowance for the total diminution of value of his property. The present railroad condemnation statutes, KRS 416.020 to 416.080, say nothing about fencing. But a special statute, KRS 416.110, relating to condemnation by a fiscal court for road purposes, still provides for separate allowance for fencing and for "the value of trees or shrubbery taken". We hereby abolish the old fencing rule and we hold that the provisions of KRS 416.110 for separate fixing of damages for fencing, trees and shrubbery are inoperative, for the same reason as stated above why statutory provisions requiring the separate fixing of *taking* and *resulting* damages are inoperative.

## OFFSETTING BENEFITS

Because the question of offsetting benefits against damages is entangled with the

question of whether *taking* damages should be separated from *resulting* damages, we consider it necessary to reexamine the question of offsetting benefits. Also, the question is specifically in issue in this case because the instructions authorized offsetting benefits against *resulting* damages to the *landowners* (but not to the lessees).

We take as our starting point the decision in Broadway Coal Mining Co. v. Smith, 136 Ky. 725, 125 S.W. 157. It was there held, unequivocally, that benefits may not *constitutionally* be offset against either *taking* damages or *resulting* damages. Reference was made to some earlier decisions, such as Asher v. Louisville & N. R. Co., 87 Ky. 391, 8 S.W. 854, where the same rule had been announced, but which purported to recognize a third category of damages— "incidental damage" or "consequential inconvenience or injury"—(in addition to *taking* damages and *direct resulting* damages) against which benefits could be offset. (The opinion in the Asher case recognized the illusory character of this third category in saying, 8 S.W. 856, that it was "difficult to define the meaning of the words 'incidental damage'".) However, the opinion in the Broadway Coal Mining Co. case held specifically that questions of "consequential" injuries or prospective benefits should not be submitted to the jury because both are too remote and speculative. So it would seem clear that the case abolished the purported third category of damages.

Thorough research on our part has failed to disclose any case in this jurisdiction undertaking to define "consequential inconvenience or injury" or "incidental damage," or holding that any particular kind of injury or damage fell in that category. So we have come to the conclusion that the purported third category was never anything more than a myth. It is difficult to conceive how a property owner could suffer damage of a permanent nature in addition to the diminution in market value of his property, and even if there were such kind of damage, why it should be offset against an enhancement of value.

Despite the ruling in the Broadway Coal Mining Co. case that there can be no offsetting at all, some careless language in later opinions gave Nichols the impression that under Kentucky law benefits might be offset against damages for "consequential injury and inconvenience." 3 Nichols on Eminent Domain, Sec. 8.6211. This in turn led this Court, in Commonwealth Dept. of Highways v. Evans, Ky., 361 S.W.2d 766, to give continued credence to this erroneous conception, although in the Evans case nothing in the category of "consequential injury or inconvenience" was found to be present.

■■■ It is our conclusion that there is no such thing as "consequential injury or inconvenience," or "incidental damage," as distinguished from diminution in market value. Therefore the basis for the purported right of the condemnor to have benefits set off against such injuries or damage was nonexistent.

Confusion has been introduced by statements in such cases as Music v. Big Sandy & K. R. R. Co., 163 Ky. 628, 174 S.W. 44, Louisville & N. R. Co. v. Hargis, 230 Ky. 806, 20 S.W.2d 991, and East Kentucky Rural Electric Coop. Corp. v. Smith, Ky., 310 S.W.2d 535, to the effect that benefits may be set off against "incidental damages." If these statements meant that benefits could be set off against *resulting* damages they were in direct contradiction of the Broadway Coal Mining Co. case and a host of other Kentucky cases. On the other hand, if they meant to perpetuate the old purported third category of damages they not only ignored the Broadway Coal Mining Co. case but failed to appreciate that such category was a fantasy.

Further confusion has been caused by the opinion in Frenel v. Commonwealth, Ky., 331 S.W.2d 710, which in addition to saying that benefits may be set off against *resulting* damages, gives as the reason for such rule that the right to *resulting* damages is only *statutory,* whereas the right to *taking* damages is *constitutional.* Under

the former decisions hereinbefore discussed the statement in the Frenel case that benefits may be set off against *resulting* damages was erroneous. The Frenel case further erred in saying that the right to resulting damages is only statutory, because as pointed out in the Broadway Coal Mining Co. case, Section 242 of the Constitution requires payment of just compensation for property taken, *injured* or destroyed.

We have undertaken up to this point to clarify the status of the *existing* law of Kentucky on the matter of offsetting benefits against damages. Our research has led us, however, now to question whether that existing law is sound.

We return in discussion to the Broadway Coal Mining Co. case, which undertakes to set forth all of the reasons why benefits can not be set off against damages. Four reasons are discernible from the opinion. One, based on quotations from a previous decision, is that the owner should be entitled to *decide for himself* whether the public improvement has benefited his land, and "the public ought not to decide for any citizen how far, or whether at all, he will be pecuniarly benefited by a public work." Another is that when land is taken involuntarily from an owner for a public improvement which he is opposed to, somehow he should be paid for the indignity he has suffered. Obviously, neither of these reasons has any merit or any acceptance in other judicial decisions. As concerns the first, certainly if the "public" in the form of a jury is qualified to decide how much the property has been *reduced* in value, it is qualified to decide whether and how much it has been *enhanced* in value. As concerns the second, it is the firmly established, though admittedly somewhat harsh rule, that all the owner is entitled to is the diminution in market value of his property, without regard to any infringement of his desires not to part with his property.

A third reason found in the Broadway opinion is that benefits are too remote and speculative to be entitled to consideration. We agree that speculative estimates or remote benefits should not be submitted to the jury. But we do not agree that *all* benefits necessarily are too remote and speculative. We see no reason why the testimony of a qualified witness with knowledge of land values along improved highways in the community, that the particular property will sell for a specific price, taking into consideration the improvement of the highway on which it abuts, is any more speculative than the testimony of a similar witness as to the value of the property before the taking, or its value after the taking without considering the improvement.

The fourth, and probably main reason stated in the Broadway case is that the Constitution requires that the landowner be paid for the property taken from him *in money,* and he cannot be compelled to accept *benefits* in lieu of money. The fallacy in this is that it begs the question: *What property* has been taken?

The Supreme Court of the United States has held that there is no violation of the Fifth Amendment to the United States Constitution, which prohibits the taking of private property for public use "without just compensation," by a statute requiring that benefits be offset against both *taking* and *resulting* damages. Bauman v. Ross, 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270. This holding has found acceptance in a number of state courts. See Rudder v. Limestone County, 220 Ala. 485, 125 So. 670, 68 A.L.R. 776; Annotation, 68 A.L.R. 784.

The reasoning of the Supreme Court was, in substance, that the "property" of a landowner is a *value unit,* and when a portion of the land is taken, and perhaps the remainder damaged, the only question is: How much has the *unit* been reduced in *value,* without regard to what *physical components* may have been taken from the unit? In other words, "property" within the meaning of constitutional eminent domain provisions is *value* and not tangible

substances. The owner's "property" is taken in condemnation only to the extent he has lost value. We think this view is sound.

The rule in a number of jurisdictions seems to be that benefits may be offset against *resulting* damages but not against *taking* damages. 18 Am.Jur., Eminent Domain, Sec. 299, p. 944. We see no sense in this rule, because it simply means that benefits may be set off against loss of an *intangible* but not against loss of a *tangible*. The *reality* of the loss is the same in either case, so we can find no basis for the distinction. Orgel says that the courts observing this distinction do not "pursue logic." 1 Orgel, Valuation Under Eminent Domain, Sec. 7, p. 48.

Both Orgel and Nichols recognize that logically, under the "before and after" rule, benefits should be set off against damages. 1 Orgel, Valuation Under Eminent Domain, Sec. 7, p. 39; 3 Nichols on Eminent Domain, Sec. 8.6206(1), p. 67. Nichols says, " * * * there is no answer in legal theory to the logic that special benefits can be set off from the entire compensation." (Sec. 8.6206(1), p. 67) Orgel suggests that the rules of various courts prohibiting or restricting the setting off of benefits grew out of the multitude of railroad condemnations in the late 1800's, and the attitude of the public towards private, profit-making corporations. 1 Orgel, Valuation Under Eminent Domain, Sec. 7, pp. 43 to 46. Nichols indicates his belief that the rules are attributable to fears of the courts that juries would be overly optimistic as to benefits and thus would not award adequate damages. 3 Nichols on Eminent Domain, Sec. 8.6206(1), p. 67. In view of present day attitudes of juries we may say that such fears seem now to be wholly groundless.

The argument has been made that it is *unfair* to set off the benefits of a highway improvement against the damages to farmer A, a part of whose property has been taken for the highway, when farmer B, across the road, none of whose land has been taken, receives the benefit of full enhancement of the value of his land without any setoff. We think the answer to this argument has to be that the Constitution not only guarantees to the property owner that he will be paid just compensation for the property taken from him, but it *limits* the compensation to the loss sustained. Chesapeake & O. Canal Co. v. Key, 3 Cranch, C.C. 559, Fed.Cas.No.2,649. If in truth and in fact the owner's loss has been reduced by an enhancement in value of his remaining land it would violate the Constitution to pay him compensation without regard to the enhancement. The fact that some other citizen is at the same time getting a free enhancement is just one of the inescapable inequities of society, and it is no reason why the condemnor must pay more than the loss sustained by the person whose property was taken.

■ A problem is presented by the *statutes*, KRS 177.083, 416.020, 416.050, which provide that benefits shall be set off against *resulting* damages only. If these statutes are valid, we are faced with the necessity of requiring to be done what at an earlier point in this opinion we have held should not be done, namely, determining and separating *taking* damages and *resulting* damages, because otherwise there would be no way of offsetting benefits against *resulting* damages only. It is our opinion, however, that a proper construction of the Constitution, Sections 13 and 242, *requires* that benefits be taken into consideration in determining the total loss of value the owner has sustained. This means that the statutes, in so far as they provide that benefits can be set off *only* against *resulting* damages, are unconstitutional.

■ Our ultimate conclusion on this phase of the case is that in cases where part of a tract of land is taken by condemnation the only fact for the jury to determine (as concerns damages) is the difference in market value of the tract before and after the taking. (In cases involving *leased*

property there will be the additional fact, hereinbefore indicated, of value subject to the lease. Temporary easements also are a separate matter.) The jury should be instructed that in determining the value after the taking they shall take into consideration any enhancement in value growing out of the improvement that is attributable to the advantageous relation of the property to the improvement, as distinguished from general enhancement of values in the community generally to property not even abutting on the improvement. (This qualification will restrict consideration to *special* benefits as distinguished from *general* benefits. See 18 Am.Jur., Eminent Domain, Sec. 298, p. 942.) No questions of *taking* damages or *resulting* damages shall be submitted to the jury.

### TRIAL OF ALL ISSUES TOGETHER WHERE LEASED PROPERTY IS INVOLVED

 Turning now to another question, the Commonwealth maintains that in cases involving condemnation of leased property the issues between the Commonwealth on the one side and the landowner and lessee on the other side should be confined to the determination of damages to the land as a whole, without regard to any allocation between the landlord and tenant, and that the allocation should be tried separately and later (perhaps before the same jury). There was a motion to that end in this case, which was overruled. We are inclined to agree with the Commonwealth's argument that under the method formerly in use for determining compensation for leased property the Commonwealth was placed in a prejudicial position, mainly because the method operated in practice in such a way as to enable the combined awards to the landlord and tenant to exceed the total damage to the property as a whole. But we are of the opinion that under the new formula here prescribed there is little danger of prejudice to the Commonwealth from trying all of the issues together, because the major fact determinations will relate

to value of the property as a whole, before and after the taking, and the allocation between landlord and tenant will be mainly a matter of mathematical computation by the court.

### DAMAGES FOR LOSS OF BUSINESS DURING CONSTRUCTION PERIOD

There is another serious error in the case, in addition to error in the instructions, which requires reversal of the judgment. It arises from the fact that over the objections of the Commonwealth the lessees of the restaurant were allowed to assert a claim, and were awarded damages of $8,500, for loss of profits during the period the highway was under construction.

 We have had no reported cases in Kentucky specifically deciding the question of whether recovery may be had by an abutting property owner for damages for loss of business resulting from the temporary closing or obstruction of a highway during a period of construction work on the highway. However, the prevailing rule in other jurisdictions is that such damages are not recoverable. See 18 Am.Jur., Eminent Domain, Sec. 142, p. 770; Annotation, 68 A.L.R. 340; 4 Nichols on Eminent Domain, 3rd Ed., Sec. 13.32, p. 272; 29 C.J.S. Eminent Domain, § 113, p. 925; 29 C.J.S. Eminent Domain § 162, p. 1032. Our research indicates that in those cases where recovery has been allowed there has been some element of an *unnecessary* closing or interference. See Wine v. Commonwealth, 301 Mass. 451, 17 N.E.2d 445, 120 A.L.R. 889; Annotation, 120 A.L.R. 900.

The reasoning behind the majority rule seems to be that the abutting owner has no *property right* in the continued maintenance of the highway. This is in accord with the rule in this jurisdiction that the abutting owner's right in the highway is only the right of reasonable access to the highway system. Commonwealth Dept. of Highways v. Carlisle, Ky., 363 S.W.2d 104. This has to mean that he has only the right of access to such highways, and of such surface con-

·dition, as the state chooses to provide in the reasonable administration of its highway system. The abutting owner certainly has no property right to have a highway of a particular surface or pavement.

The evidence in the instant case shows that on only four occasions during the eight-month construction period was access to the restaurant from the highway blocked. The evidence does not show what period of time was involved on each occasion, but presumably it was only a matter of hours. We think that such comparatively insignificant blocking of access cannot be considered a compensable interference with the owner's right of *reasonable* access, because the right must yield some to the necessities of highway construction work.

█ It is clear that the basis of the claim for damages here is loss of business resulting from the torn-up condition of the surface of the highway, rather than interference with access to the highway. Such loss is not compensable because it differs only in degree, and not in kind, from the loss suffered by the public generally from highway construction work. Cf. Department of Highways v. Jackson, Ky., 302 S.W.2d 373.

The so-called "reverse condemnation" cases relied upon by the lessees here, such as Commonwealth v. Kelley, 314 Ky. 581, 236 S.W.2d 695, are not applicable because they involved a *taking of property*, whereas here there is no such taking because the abutting owner has no property right in the continued maintenance of the particular highway. Standiford Civic Club v. Commonwealth, Ky., 289 S.W.2d 498, on the point for which the appellees cite it, was overruled by Department of Highways v. Jackson, Ky., 302 S.W.2d 373.

### EFFECT OF CURBS ON ACCESS

█ Several other questions require discussion. One relates to claims asserted in this case for damages resulting from interference with access attributed to the construction of curbs along the edge of the new

highway. Prior to the construction of the new highway there was no curb along the level 125-foot frontage north of the restaurant parcel. However, the only entranceway actually in use on this frontage was a 14-foot wide driveway leading back to the residence. The new highway will have a curb along the frontage except where the driveway enters the highway. The landowners claim that in order to develop their farm for subdivision purposes it will be necessary to have a wider driveway, perhaps 60 feet, and that the subdivision value of the land has been destroyed because by the curb their access is limited to 14 feet.

A similar claim is made by the restaurant lessees. Before the construction of the new highway there was access to the highway along the entire 150-foot frontage of the restaurant parcel, except for places at which the lessees had placed guard posts, a sign, and some shrubbery. The new highway will have a curb along the frontage of the restaurant parcel except for the spaces of a 50-foot entrance and a 29-foot exit. The lessees claim damages from alleged reduction of access by reason of the curb.

We think neither of the claims is valid, for the reasons stated in Commonwealth Dept. of Highways v. Carlisle, Ky., 363 S. W.2d 104. The Commonwealth has not undertaken to *condemn* any rights of access. The curbs are not absolute and permanent bars to access, but may be removed with permission of the Highway Department upon a showing of a reasonable necessity for further access. If the Department refuses to permit further access under claimed authority of the police power the question of whether such refusal is justified may be litigated in an appropriate action. There is no issue of access rights in the present case because the Commonwealth has not *taken* any access rights.

### PROBATIVE VALUE OF TESTIMONY—EXCESSIVE DAMAGES

Our views on the matter of the probative value of the testimony of the condemnees'

witnesses in this case, concerning which the Commonwealth makes a detailed argument, are fully set forth in Commonwealth, Dept. of Highways v. Tyree, Ky., 365 S.W.2d 472, (decided March 1, 1963).

As concerns any question of excessiveness of the damages awarded in this case we express no opinion, since upon another trial the damages will be determined upon an entirely different basis.

## LISTING OF WITNESSES BEFORE TRIAL

One final question remains for our consideration. It arises out of the fact that the Commonwealth, in response to interrogatories submitted by the condemnees a week or two before the trial, listed the names of the witnesses the Commonwealth intended to use on the trial, including some engineers and appraisers. Upon the trial, however, the Commonwealth undertook to use two appraiser witnesses who had not been listed, in place of two who had been listed. Upon objection's being made by the condemnees the court refused to permit the unlisted witnesses to testify. The Commonwealth maintains that the court erred in so ruling.

The question is a difficult one, and is a new one in this jurisdiction. See Clay, CR, 26.02, Comment 3, pp. 269, 270; Grauman, Deposition and Discovery, 47 Kentucky Law Journal 175. We feel that we should not answer the question until it is squarely presented. It is not necessary to answer it in this case because we are reversing the judgment on other grounds and the question may not arise on another trial. In our opinion, even if the listing that was made was properly held to be binding on the Commonwealth at the *first* trial, that particular listing, because of lapse of time, could not be binding at a *second* trial. Whether the question will arise at the second trial will depend upon whether there is a new request for a listing of witnesses, whether that request is honered or refused, and whether, if honored, the party of whom the request was made undertakes to use an unlisted witness at the trial.

## OVERRULING—PROSPECTIVE APPLICATION

By way of conclusion, we note that in this opinion we have laid down three new sets of rules that depart from former rules of this jurisdiction; one relating to determination and allocation of damages in condemnation of leased property; another abolishing the separate fixing and stating of *taking* damages and *resulting* damages (and special damages such as for fencing, trees and shrubbery) and establishing the simple "before and after" rule; and another authorizing the offsetting of benefits against damages. The former decisions of this Court cited in this opinion (and all others of similar import) that are in conflict with these new rules are overruled to the extent of the conflict.

As concerns the first rule (relating to *leased* property) we see no reason why the rule should be given prospective effect only, because the former rules on this subject were not complete and had no substantial period of existence or experience of application. However, the former rules relating to separation of *taking* and *resulting* damages (and the separate treatment of fencing), and prohibiting the offsetting of benefits, have been in existence in Kentucky for such a long period of time and have had such experience of application that in our opinion the new rules replacing them should not be held applicable to trials occurring before the issuance of the mandate on this opinion.

To avoid any possible misunderstanding, we wish to make clear that the judgment in the instant case is being reversed not for failure to observe the new rules herein laid down, but for failure to comply with the formerly existing rules.

The judgment is reversed for further proceedings in conformity with this opinion.