ORPHANS' COURT— POWER TO ANNEX CONDITIONS TO PAYMENT OF DIVIDEND OUT OF INTESTATE'S ESTATE.

The orphans' court has no power to annex conditions to the payment of the dividend of a judgment at law recovered against the intestate for instalments due upon the stock of the Chesapeake and Ohio Canal Company.

The Chesapeake and Ohio Canal Company had recovered judgment against the intestate in his lifetime, upon motion and ten days' notice, for $2,500, for instalments upon 50 shares of the stock in that company, under the 5th section of the charter. After his death, the orphans' court for Washington county, on the 2d of August, 1839, ordered, "That [Lewis Johnson] the administrator of William Otis make a dividend among the judgment creditors of said Otis, of thirty-six and an half per cent., on their respective claims." And on the 21st of November, 1839, "at a special court held this day, at the request of Lewis Johnson, the administrator of William Otis, the court passed the following order: Ordered, that the administrator of William Otis pay to the Chesapeake and Ohio Canal Company, the amount of their dividend of said estate, provided he receive from them a certificate of the stock of said company, equal to the whole amount paid in." From this order the canal company appealed to this court.

Brent & Brent, for the appellants, contended that the effect of this order would be to compel them to issue full certificates of stock to the amount of the dividend, at $100 a share, which they were not bound to do. They had a right to apply the payment equally to all the shares subscribed for, or owned by the intestate.

Mr. Morfit, contra. There was not judgment at law. The court had no jurisdiction to render judgment on motion. The judgment was by default for breach of contract. There should have been a writ of inquiry of damages. The defendant had a right to apply the payment to particular shares, and thus obtain certificates in full.

THE COURT reversed the order of the orphans' court, with costs.

[1] [Reported by Hon. William Cranch, Chief Judge.]

## Case No. 2,649.

### CHESAPEAKE & O. CANAL CO. v. KEY.

[3 Cranch, C. C. 599.] [1]

Circuit Court, District of Columbia. July 20, 1829.

EMINENT DOMAIN—COMPENSATION — THE INQUISITION — CHESAPEAKE AND OHIO CANAL COMPANY —CONSTRUCTION OF CHARTER.

1. To condemn the land of an individual for the use of the Chesapeake and Ohio Canal Company, is to take private property for public use.

[Cited historically in Shoemaker v. U. S., 147 U. S. 282, 13 Sup. Ct. 370.]

2. The damages assessed by the jury must be considered as the just compensation required by the amendment of the constitution, which forbids the taking of private property for public use without just compensation. That compensation must be just towards the public, as well as just towards the individual whose property is taken.

3. The charter granted by Virginia having been ratified and confirmed by congress, became as much an act of congress, so far as it is applicable to the District of Columbia, as if it had been reënacted with such modifications as might be necessary to fit it for use in the District.

4. The power to take private property for public use, upon just compensation, is not a power in derogation of common right. All property is held subject to that power; and the right thus to take private property for public use, is as much common right as that of the individual. The canal is a great highway; and all lands are held subject to the right of the public to make a highway through them.

5. The charter should be so construed as to carry into effect the will of the legislature. The words "from" and "at" do not always exclude the place to which they refer.

6. The beginning of the eastern section of the canal is not precisely fixed by the charter, but is left to the discretion of the company, with this limitation only, that it should be in the District of Columbia, and upon tide water.

7. A certain day must be fixed, in the warrant, for the meeting of the jury on the land, and the want thereof is fatal to the inquisition.

This was a motion by F. S. Key, to set aside an inquisition which had been taken and returned to the court, condemning, for the use of the canal, a lot in Georgetown, owned by him.

The cause was argued by him and Mr. Jones, on the 23d and 25th of May, 1829. The statement of the case will appear in the opinion of the court.

CRANCH, Chief Judge. This cause comes before the court by a motion to set aside the inquisition which condemns Mr. Key's land in Georgetown, for the purposes of the canal, under the 15th section of the charter granted by Virginia, and confirmed by Maryland, Pennsylvania, and the United States. By that section it is enacted that the inquisition taken and returned in the manner therein set forth, shall be affirmed, unless good cause be shown against it. Mr. Key, in showing

[1] [Reported by Hon. William Cranch, Chief Judge.]

cause, has taken the following objections to the inquisition, and to the proceedings upon which it was founded. 1. That the provisions of the charter for condemning land, are unconstitutional, because no provision is made for just compensation. 2. That the act of Virginia, granting the charter, is not in force in this district, because that act is only confirmed, not reënacted by congress. 3. That the company has no right to condemn land in Georgetown. 4. That the warrant is insufficient in form and substance. 5. That some of the jurors were interested. 6. That the marshal has only certified that the fourteen jurors who were sworn were not interested; and not that the whole eighteen who were summoned, were not interested. 7. That the oath was not properly administered; and was not administered upon the land. 8. That the inquisition does not cure the defect of the marshal's return, nor the faults of the warrant.

1. That the company has no right to condemn land, because that clause of the charter, so far as it attempts to authorize such condemnation is unconstitutional, inasmuch as it does not provide a just compensation to the party whose land is sought to be condemned. The words of the 5th amendment of the constitution of the United States, upon which this objection is founded, are these, "Nor shall private property be taken for public use without just compensation." This amendment admits the principle that private property may be taken for public use, if just compensation be made. It is not denied that to take land for the use of the canal, is to take it for public use. The question, then, is, whether the charter provides for making a just compensation. It is said that it does not, because it directs that, in every such valuation and assessment of damages, the jury shall be, and they are hereby instructed to consider, in determining and fixing the amount thereof, the actual benefit which will accrue to the owner from conducting the canal through, or erecting any of the said works upon his land, and to regulate their verdict thereby; except that no assessment shall require any such owner to pay or contribute any thing to the said company, where such benefit shall exceed, in the estimate of the jury, the value and damages ascertained as "aforesaid." It is contended, that the constitution provides a positive, not a conjectural compensation; that under the provisions of this charter, it may happen that no compensation at all may be made; that the expected benefits which the jury shall have estimated, may never arrive; and that, therefore, the jury should not have been required, by the charter, to consider them in their estimate of value and damages. But the constitution only provides for the general principle. The means of ascertaining the just compensation were left to be decided by the public authority, which should give the power to take the private property for public use.

All the states, prior to the adoption of the constitution, exercised this right, and still continue to exercise it where it is necessary to condemn land for roads, and other public uses; and they have generally provided for compensation through the intervention of a jury. It is impossible for the legislature to fix the compensation in every individual case. It can only provide a tribunal to examine the circumstances of each case, and to estimate the just compensation. If the jury had not been required by the charter to consider the benefit as well as the damage, they would still have been at liberty to do so, for the constitution does not require that the value should be paid, but that just compensation should be given. Just compensation means a compensation which would be just in regard to the public, as well as in regard to the individual; and if the jury should be satisfied that the individual would, by the proposed public work, receive a benefit to the full value of the property taken, it could not be said to be a just compensation, to give him the full value. If the jury would have a right to consider the benefit as well as the damage, without the provision of the charter which requires them to do so, the same objection would still exist, namely, that under the provisions of the charter, it might happen that no compensation at all, or, at most, a nominal compensation, would be made. The insertion, therefore, of that provision in the charter which requires the jury to do what they would be competent to do without such a provision, and which, in order to ascertain a compensation which should be just towards the public, as well as just towards the individual, they ought to do, cannot be considered as repugnant to the constitution.

2. But it is objected, 2dly, that the canal company has no right to condemn land within the District of Columbia; because Virginia had no right to legislate for that district, or in regard to lands therein. It is said that the act of congress only ratifies and confirms, but does not reënact the act of the state of Virginia, and that even that ratification is limited; that the act of Virginia is only ratified and confirmed so far as it may be necessary to enable the company to carry into effect the provisions thereof in the District of Columbia; and that "the provisions thereof," are not applicable to the state of things in that district, where there is no sheriff, no county clerk, and no prothonotary. This is understood to be the substance of the objection. For the purpose of considering this objection, I shall take it for granted that, by the charter, it is contemplated that some part, at least, of the canal, or its works, will be in the District of Columbia. It is evident, from a perusal of the charter granted by Virginia, that the legislature intended that it should be coextensive with the whole object in view, and should confer all the powers necessary to accomplish it. It professes to legislate as well over the District

of Columbia and the state of Maryland, as over Virginia; but it restrains itself until the consent of congress and Maryland should be obtained. That consent only was wanting to give validity to its legislation; and it is expressly provided that the charter shall be so construed as to fit it for use in Maryland and in the District of Columbia. This charter, therefore, having been ratified and confirmed by Maryland and by congress, in the manner required by the legislature of Virginia, has become as much an act of congress, so far as respects this district, as if it had been expressly reënacted with such modifications as might be necessary to fit it for use in the district. In order to show that it was the intention of the legislature of Virginia, to legislate in regard to such part of the canal as should be within the District of Columbia, it is only necessary to read the provisions of the charter. In the first section, they expressly require the assent of the legislatures of Maryland, Pennsylvania, and the United States, before any of its provisions should take effect. By the 14th section they require the assent of the same States, and of the United States, to any alteration of the tolls for the use of the canal; that is, (according to the proposition before assumed,) a canal extending into the district. In the 15th section it is said to be necessary "for making the said canal," that provision should be made for condemning a quantity of land for that purpose; and it provides for the condemnation of any land "through which the said canal is intended to pass." These provisions show that the power to condemn land, was intended to be coextensive with the canal itself. And the 22d section provides that so much of the charter "as respects the canal and works designed to be constructed in the District of Columbia, and the states of Virginia and Maryland, shall take effect, with such necessary modification in the construction thereof, as shall fit it for such limited application and use upon the assent of the congress of the United States, and the legislature of Maryland being given thereto." All that is necessary to fit the provisions of the charter for use in the District of Columbia, so far as it regards the condemnation of land, is, so to modify it by construction, as to substitute the marshal of the district for the sheriff of the county; the clerk of the circuit court for this county, for the clerk of the county, and the circuit court, sitting in the county, for the county court, which seems to be alluded to in the charter. Such a modification in the construction of the charter is required by the charter itself; and, being confirmed by congress, is equivalent to an express provision by congress to that effect. The right, therefore, and the means, to condemn land in the District of Columbia, are given to the company, provided the charter intended to give, and purports to give the company a right to construct any

part of the canal, or of its works in that district.

The third objection is, that the company has no authority to condemn land in Georgetown. Upon this point it has been contended, that the authority to condemn land for public use, without the consent of the owner, is in derogation of common right; and, therefore, the charter must be construed strictly. That none of the expressions in the charter indicate clearly a right in the company to extend the canal below the highest convenient and safe navigable tide-water of the Potomac. Thus the words in the preamble, "from the tide-water of the river Potomac, in the District of Columbia," are perfectly satisfied by commencing the canal at the highest part of the tide-water of the river Potomac, in the district; and the fourth section, which gives the company its authority to make the canal, only gives them power to make a canal from the tide-water of the Potomac, in the said district. The word "from," it is said, is exclusive of the point, or place, named; and, of course, the canal must strictly, according to the terms of the charter, begin at the highest point of tide-water in the district. But it is admitted that this strictness must have a reasonable construction; and that it must mean the highest point of safe and convenient navigable tide-water. So in the twentieth section of the charter, which describes and defines the eastern and western sections of the canal, the words are—"That the first, or eastern section of the canal, shall begin at the District of Columbia, on tide-water, and terminate at or near the bank of Savage river;" "that the second, or western section, shall commence at the said termination," &c., "to the highest steamboat navigation of the Ohio river." Here the word "at" is also supposed to be exclusive of the place named. A person, it is said, may be at a place and not in it; and the word is evidently used in that sense in the subsequent clause of the same sentence, where it is said that the second section shall commence at the termination of the first. Here it is impossible that "at" should mean "in." Then, in the strict construction which ought to be given to this charter, it is said that, if the tide-water of the Potomac extends as high as the upper line of the District of Columbia, the canal must stop at that line. But here, also, it is admitted, that this strict requisition of the charter must be relaxed, by the application of a reasonable construction; introducing a proviso that the tide-water, where the upper line of the district crosses the river, should be safely and conveniently navigable; and that, if it should not be so, the canal may be continued into the district until it shall meet such navigable water, but no further.

The only words in the charter which describe or define the lower terminus of the canal, are those which have been cited from

the preamble, and from the twentieth section. The strict construction of those words, thus contended for, it is said, is corroborated by the terms of the charter of the old Potomac Company, and its practice under that charter; by the memorials of the committee of the canal convention to the legislatures of Maryland and Virginia, in 1823; and of the central committee to congress, in April, 1826; by the report of General Bernard, the chief executive officer of the engineer department; and by the common council of the city of Washington, in their resolution of the 5th of July, 1827, for calling a meeting of the inhabitants to consider the subject of the canal. Whether it will be necessary or proper for the court to resort to such extraneous evidence of the meaning of the charter, will depend upon the question, whether, after applying the proper rule of construction to the words of the charter itself, they shall remain obscure or ambiguous, in relation to the point in dispute?

The first question, then, is, what is the proper rule of construction applicable to charters, and such legislative acts as are in the nature of charters? Is it that the words shall have the strongest possible construction against the grantee? Or is it that they shall have a reasonable construction, drawn from the whole context of the instrument, or act, to carry into effect the intention of the parties? Here it is said that the strictest construction ought to be adopted against the powers granted to the company, because those powers are in derogation of common right. But is that true? Is the right to take private property for public use, upon making just compensation, in derogation of common right? The right of the public has been recognized by the constitution of the United States, and has, from time immemorial, been exercised by the several states ever since the Revolution; and was, before that period, exercised by the colonies, and by the mother country. It is one of the conditions upon which all property is holden by individuals; and, as a member of the public, the individual himself is as much interested in maintaining it, as he is in maintaining his individual rights. The public right is as much common right as the individual right. This public right is not a power exercised merely because the sovereign power cannot be controlled, and therefore in derogation of common right; but it is a constitutional power, primarily assented to by the people themselves, in their original primitive sovereignty, not applicable to any particular individual, but extending equally to all, and creating a lien upon all property, into whose hands soever it may come. The contemplated canal is intended to be a great highway; and no man can be ignorant that he holds his land always subject to the right of the public to make a highway through it, whenever the great interests of the nation

or of the state may require it. It does not seem to me, therefore, that the power given by this charter, to condemn land for this highway, is such a power in derogation of common right as will justify the court in confining the words "at" and "from" to their strictest and strongest sense, against the company. Nor would I, on the other hand, entirely adopt the rule applicable to grants,— that the words shall be taken most strongly against the grantor; but the rule most properly applicable seems to be that which is applied to wills, and to ordinary legislative acts; to wit, to give that construction, which will best carry into effect the will of the testator or of the legislature.

The question then occurs, what was the will of the legislature of Virginia, in regard to the lower terminus of the canal? Did they mean to fix the precise spot at which the water of the canal should be mingled with the tide-water of the Potomac? Or did they mean to leave it to the discretion of the company, under any and what limits? The word "from" is not always, and, indeed, in common conversation is seldom exclusive of the place named. Thus, if I should say I had just come from Philadelphia, no one would suppose that I spoke the truth if I had never been in Philadelphia; and, if I had sworn to the fact, I could hardly be saved from the penalty of perjury, by proving that I came from the utmost boundary of the city, without having been either within or upon the boundary. "From" a town, or district, generally means from some indefinite place within that town, or district; and the expression is justified, if the person came from any part of the town or district. So the word "at," in ordinary speech, more generally means within than without. Thus. at a town, or at a county, means at some place within the town, or within the county, rather than a place without, or even at the utmost verge of, but not in the town or county. So in indictments, where the utmost legal precision is necessary, the fact is generally stated to have been done at the place; and, if it were not done in the place, the venue would be wrong. And in indictments in this district, where we have no hamlets or parishes, the act is generally averred to have been committed at the county; and if that did not mean within the county, the court would have no jurisdiction of the cause. The words "from" and "at," therefore, have not, in general, an exclusive signification; nor are they, in the charter, connected with any other words which render it necessary that they should be so construed. The words in the preamble are—"A navigable canal from the tide-water of the river Potomac, in the District of Columbia." This description would be fully justified by a canal from any part of the tide-water of the river Potomac, in that district. In the twentieth section, the words are— "The first, or eastern section, shall begin at

the District of Columbia, on tide-water." This description, also, would be justified by a canal beginning in any part of the district, upon tide-water. There is no expression in the charter inconsistent with such a construction. On the contrary, there are several provisions which strongly corroborate it.

The first enacting clause of the charter, by Virginia, of the 27th of January, 1824, requires the assent of the congress of the United States to the provisions of that act; and, by the twenty-third section it is declared, that such assent is understood and taken to relate only to their authority as the legislature of the District of Columbia. But if the words "from" and "at" are to have this exclusive signification, no part of the canal could be within the district, and the assent of congress, as the local legislature of the district, would be wholly unnecessary. So in that case, the assent of congress, which is required by the fourteenth section to an alteration of the rates of toll, would be entirely useless. So in the twenty-first section, a right is given to the United States to retain the power to extend the canal in (not into) the District of Columbia, on either side, or both sides, of the river Potomac; and the same section provides, that "the United States shall authorize the states of Virginia and Maryland, or either of them, to take and continue a canal from any point of the above-named canal, or the termination thereof, through the territory of the District of Columbia." And by the twenty-second section it is enacted, "that this act, or so much thereof as respects the canal and works designed to be constructed in the District of Columbia, and states of Virginia and Maryland, shall take effect, with such necessary modification in the construction thereof, as shall fit it for such limited application or use, upon the assent of the congress of the United States and the legislature of Maryland being given thereto; and, upon its receiving the further assent of the legislature of Pennsylvania, the whole, and every section and part thereof shall be valid, and in full force and operation." So, also, the confirming act of Maryland, of the 31st of January, 1825, says —— "And for the purpose of removing all doubts as to the right of the state of Maryland to intersect the said Chesapeake and Ohio Canal, for the purpose of constructing a lateral canal, or canals, to Baltimore, or elsewhere, in the state of Maryland, from that part of the said Chesapeake and Ohio Canal which shall be within the District of Columbia, be it further enacted," &c.; thereby clearly showing the understanding of the legislature of Maryland, in the very act of confirming the charter, that a part of the Chesapeake and Ohio Canal would be constructed within this district. So also the act of congress of the 3d of March, 1825 (4 Stat. 101), confirming the charter, enacts, "that the act of the legislature of Virginia, entitled an act incorporating the Chesapeake

and Ohio Canal Company, be and the same is hereby ratified and confirmed, so far as may be necessary for the purpose of enabling any company that may hereafter be formed by authority of said act of incorporation, to carry into effect the provisions thereof, in the District of Columbia, within the exclusive jurisdiction of the United States, and no further." So also the second section of the same act speaks of the right of Virginia and Maryland, "to take and continue a canal from any point of the Chesapeake and Ohio Canal, to any other point within the territory of the District of Columbia," showing clearly the understanding of congress that a part of the canal would be made in the district. Again, by the fourteenth section of the charter, the old Potomac Company is authorized to transfer, and the new company to accept, all the property, rights, and privileges of the Potomac Company, which has been done, and among that property are locks below the little falls, which are within the district, and which are to be kept in repair by the new company until the new works shall be substituted for them. So, also, it is enacted by the second section of the act of congress of the 23d of May, 1828 (4 Stat. 293), that the authority designed by the former act of congress, confirming the charter to be given to the states of Virginia and Maryland, "to extend a branch from the said canal, or to prolong the same from the termination thereof, by a continuous canal within or through the District of Columbia towards the territories of either of those states, shall be taken to be as full and complete in all respects as the authority granted by that act to the Chesapeake and Ohio Canal Company to extend the main stem of the said canal within the said district." So, also, by the act of congress of the 24th of May, 1828 (4 Stat. 293), it is enacted, "that, for the supply of water to such other canals as the state of Maryland, or Virginia, or the congress of the United States may authorize to be constructed in connection with the Chesapeake and Ohio Canal, the section of the said canal leading from the head of the little falls of the Potomac river, to the proposed basin next above Georgetown, in the District of Columbia, shall have the elevation above the tide of the river at the head of the said falls, and shall preserve throughout the whole section aforesaid a breadth at a surface of the water of not less than sixty feet, and of depth, below the same, of not less than five feet, with a suitable breadth at bottom."

Nothing can be more clear than that the legislatures of Virginia, Maryland, and the United States, expected that some part of the canal and works would be constructed within the District of Columbia; and, consequently, that they did not mean to use the words "from" and "at" in their exclusive sense. If those words are not to be confined to their exclusive sense, they must be taken in their ordinary sense; and, taken in their ordinary

sense, they authorize the company to commence the canal on any part of the tide water in the District of Columbia. Who, then, is to determine the precise spot where it shall commence? Surely it must be the company, for they only have a right to make the canal; and they are bound to make it in a certain time, under the penalty of a forfeiture of their charter. They must, therefore, act upon the subject; and who shall control their discretion, if they exercise it honestly? It is said, that the object of the charter was to make the river navigable where it was not navigable before; and as it was before navigable a mile or two above Georgetown, the meaning of the legislature was, that they should commence the canal a mile or two above that town. But the legislature has not said so. The only limit they have imposed to the discretion of the company is, that they should begin their canal on the tide water in the District of Columbia. Besides, if that idea were to limit their powers, they would have to let their canal down into the Potomac at every point where it is already navigable. And again, it is not probable, that when the legislature was contemplating the great object of a national highway from the eastern to the western part of this continent, they would have occupied themselves with an examination of all the minute and local circumstances which must be taken into view to determine the precise spot where it would be best for all concerned that the canal should commence. But it is sufficient to say that they have not determined it, and we can easily imagine many good reasons why they have not. It has also been suggested that this company is only a substitute for the old Potomac Company; that the object is the same, and that all the property, rights, privileges, and powers of the old company are transferred to the new; and, therefore, that the new company cannot extend the canal further down into the district than the works of the old company extended. But the old company was obliged, by its charter, "to make at or near the little falls, such canal and locks, if necessary, as will be sufficient and proper to let vessels and rafts aforesaid into tide water." But no such limitation is contained in the new charter, nor are the powers of the new charter at all limited by reference to those of the old. Whatever analogy there may be between the object and powers of the old company and those of the new, it does not affect the plain and clear provisions of the latter.

Not perceiving any ambiguity or uncertainty in the provisions of the present charter, in regard to the place of commencement of the canal; and being of opinion, that the fixing the precise point of commencement is left to the discretion of the company, within the limits fixed by the charter, it is unnecessary to examine the extraneous matter which has been offered in evidence, such as the memorials of the committee of the canal conven-

tion, &c., for whatever looseness or uncertainty there might be in papers of that kind, where the precise point of beginning was not the object of those memorials, the terms seem to be sufficiently settled by the charter itself. The company, therefore, having the right to determine the precise place of commencing the eastern section of the canal, within the limits prescribed to them by their charter, and having so determined it, have a right to obtain, by agreement or condemnation, all the land that may be "necessary for the making of the said canal, dams, locks," &c.; and the only remaining question is, whether the proceedings, in obtaining the condemnation of the land mentioned in this inquisition, are correct, and can be sustained.

The first objection taken to them is, that the warrant is insufficient: 1. Because it is general, embracing land belonging to divers persons having no connection with each other; whereas there ought to have been a separate warrant for each person's land. 2. Because the warrant does not state a disagreement between the company and the defendant (Mr. Key), before the issuing the warrant, so as to justify the company in requiring a warrant against his land, or to authorize the justice of the peace to grant it; nor does it state that Mr. Key was under age, or non compos, or out of the state or county. 3. Because the warrant does not, with sufficient certainty, describe the land to be condemned. 4. Because it does not name the owners. 5. Because no definite certain day was expressed in the warrant for the jury to meet on the land. Being of opinion that the fifth objection to this warrant, namely, that it does not express a certain day for the jury to meet on the land, is fatal to this inquisition; and it being very important to all the parties concerned that the opinion of the court should be known upon the other important points in the cause which it has considered; and as the other objections taken to the proceedings involve many new and nice questions, which it will take more time to decide correctly than the court can, during the short intervals between their daily sessions, bestow upon them, the court deems it to be its duty to deliver its opinion now, upon the points which it can decide; and to decline giving any opinion upon the other points at present. The fifteenth section of the charter requires that a day should be expressed in the warrant, for the meeting of the jury upon the land. This warrant commanded the marshal to summon a jury "to meet on the said quantity of land, and lands adjacent thereto respectively, on Thursday, Friday, and Saturday, Monday, Tuesday, Wednesday, Thursday, and Friday, the ninth, tenth, and eleventh, thirteenth, fourteenth, fifteenth, sixteenth, and seventeenth days of April next, or so many days thereof as may be necessary to complete the said inquisition. Who was to say which of those days would be necessary? It is evident that no certain day is

fixed by the warrant, and for that reason it is the opinion of the court that this inquisition must, in the language of the charter, be "set aside," with costs.

The other two judges [THRUSTON and MORSELL, Circuit Judges] feeling interested in the questions involved in this cause, sat only to make a court, and declined giving any opinion; so that the foregoing opinion is, in truth, that of the CHIEF JUSTICE only.