**COMMONWEALTH of Kentucky, Transportation Cabinet, Department of Highways, Appellants,**

v.

**R.J. CORMAN RAILROAD COMPANY/MEMPHIS LINE, Appellee.**

No. 2002–SC–0004–DG.

Supreme Court of Kentucky.

Sept. 18, 2003.

Joseph B. Phillips, Bowling Green, Phillip Wicker, Elizabethtown, Counsel for Appellant.

David R. Irvin, Moynahan, Irvin & Smith, PSC, Nicholasville, George E. Strickler, Jr., Bowling Green, Counsel for Appellee.

Opinion of the Court by Justice GRAVES.

The R.J. Corman Railroad Company owns and operates the "Memphis Line," a shortline rail carrier, with tracks running approximately from Bowling Green, Kentucky, to Cumberland City, Tennessee. The Department of Highways, in connection with the widening and relocation of U.S. 68 and Ky. 80 in Logan County, Kentucky, instituted condemnation proceedings for six grade level highway crossing easements across the Memphis Line right-of-way. Four of the easements are for new crossings where the highway now crosses the railroad, while the remaining two easements provide for the replacement of secondary road crossings affected by the widening project. In addition to the crossing easements, the Department condemned a small parcel in fee in connection with one of the replacement crossings.

Pursuant to KRS 416.580, the Logan Circuit Court appointed Commissioners to ascertain the reduction in value of the Memphis Line right-of-way caused by the six grade crossing easements. The Commissioners fixed the awards at a combined total of $85,000, plus $9,000 for the fair rental value of several temporary construction easements. Both parties filed timely exceptions to these awards, and under KRS 416.620(1), the matter passed to the circuit court for trial by jury.

A jury trial was never reached because the Logan Circuit Court granted the Department's motion for summary judgment finding "as a matter of law that the Defendant has suffered no compensable loss as a result of the installation by the Plaintiff of the crossings over the Defendant's railroad track and that the Defendant is entitled to a maximum recovery of nominal damages." The Kentucky Court of Appeals, in a 2–1 decision, reversed the summary judgment and remanded the case to the circuit court. We thereafter granted discretionary review.

The Department argues that the circuit court properly granted summary judgment, because Corman's sole valuation expert was not prepared to offer competent valuation testimony at trial. The circuit court entered no findings of fact regarding its grant of summary judgment, nor was it required to do so. CR 52.01. However, it is clear that exclusion of Corman's expert testimony, if proper, would have left the railroad with no pertinent valuation evidence to present at trial, necessitating a judgment in favor of the Department. We therefore review the circuit court's judgment for error, not only in relation to the proposed valuation testimony, but also in regards to the constitutional question of whether summary judgment was permissible in this condemnation case.

When private property is condemned for public use, the measure of just compensation is the difference between the fair market value of the property immediately before the taking and the fair market value of the remainder immediately afterwards. KRS 416.660. Fair market value constitutes "the price that a willing seller will take and a willing buyer will pay for property, neither being under any compulsion to sell or buy and both being in possession of all relevant information regarding the property." *Wilhite v. Rockwell Int'l Corp.*, Ky., 83 S.W.3d 516, 519 n. 6 (2002).

Not all information may reasonably be considered in the valuation process, for some measures of value are irrelevant to the determination of fair market value, while others are deemed non-compensable. *Commonwealth, Dep't of Highways v. Tyree,* Ky., 365 S.W.2d 472, 476 (1963). The Department contends that Corman's valuation expert, Charles Howard Capito, relied entirely upon irrelevant and non-compensable factors in assessing the change in fair market value of the rail corridor.

The deposition of Mr. Capito shows that he considered two factors as impinging upon the fair market value of the Memphis Line right-of-way following the crossing condemnations: 1) the anticipated expenses for the maintenance and operation of each crossing; and 2) the estimated litigation and clean-up costs for accidents predicted to occur at the crossings over the next twenty years. From these projections, Mr. Capito calculated a reduction in value of the railroad at each crossing.

In the early crossing condemnation case of *Louisville & N. R. Co. v. City of Louisville,* 131 Ky. 108, 114 S.W. 743 (1908), our predecessor Court addressed the same question we face here, i.e., whether railroads are entitled to compensation for their potential maintenance and liability expenses when streets are extended across existing rail lines. In answering this question, the *City of Louisville* Court held:

> [R]ailroad companies cannot recover damages arising from the cost or expense of doing or maintaining those things that the state may compel them to do. So that it may safely be said, both upon principle and authority, that the appellant railroad company was not entitled to compensation for the expense it might necessarily incur in constructing, maintaining, or protecting these streets across its right of way. Nor was it entitled to compensation for the in-

creased liability to damages that it might be required to pay on account of accidents at these crossings. This element is entirely too conjectural and speculative to be considered. Accidents and resulting litigation or damages may or may not occur. But in no view of the case that we can conceive of should this feature be allowed to enter into a case upon the issue of compensation.

*Id.* at 749 (citations omitted).

Corman argues that the rationale supporting the *City of Louisville* decision has no application under the modern compensation framework provided by the 1976 Eminent Domain Act of Kentucky, KRS 416.540 to 416.570. In particular, Corman contends the *City of Louisville* Court permitted "the determination of just compensation on the basis of separate items," compensable and non-compensable elements of damage. Such a determination, according to Corman, runs counter to our contemporary and complete reliance on the fair market value standard from which to calculate compensation in condemnation cases.

Initially, we observe that the "just compensation" formula adopted by the Court in *City of Louisville* is functionally equivalent to that provided by the current Act. This should come as no surprise, since "the *measure* of damages where part of a tract of land is taken has always been the difference in market value of the tract before and after the taking (it being so held as early as *Elizabethtown & Paducah R. Co. v. Helm's Heirs,* 71 Ky. 681, 8 Bush 681 [1871] )." *Commonwealth, Dep't of Highways v. Sherrod,* Ky., 367 S.W.2d 844, 852 (1963) (emphasis in original).

Of central importance, however, we find that Corman has mischaracterized the very nature of the proscribed "elements of damage" in *City of Louisville.* Corman's

artful use of the terms "compensable" and "non-compensable" is misleading, because it implies a just compensation scheme where some harms are allocated to the condemnee notwithstanding their effect upon fair market value. Carried to its logical extreme, this argument would undermine a substantial body of precedent regarding the compensability of various harms in the condemnation context. *See, e.g., Commonwealth, Dep't of Highways v. Carlisle,* Ky., 442 S.W.2d 294, 296 (1969) ("loss of access is *not a compensable factor* if the property owner retains reasonable means of ingress and egress"); *Commonwealth, Dep't of Highways v. Cammack,* Ky., 408 S.W.2d 615, 617 (1966) ("Ordinarily, 'inconvenience' is *not compensable* in eminent domain cases"); *Commonwealth, Dep't of Highways v. Rogers,* Ky., 399 S.W.2d 706, 707 (1965) ("business losses resulting from condemnation are *not compensable*") (emphasis added in each quote).

Instead, the *City of Louisville* Court excluded certain harms from consideration because they were *irrelevant* to the computation of just compensation. Estimated liability costs were considered irrelevant because they were thought too remote and speculative in nature. Maintenance and operational expenses, on the other hand, were not even regarded by the Court as "takings" for which compensation must be made. None of these factors, therefore, were costs which could reasonably be considered in assessing the before and after values of the railroad right-of-way. Thus, after establishing the proper measure of compensation, the *City of Louisville* Court simply "confined" the evidence to that point. 114 S.W. at 750.

■ Although decided nearly one-hundred years ago, we find the analysis in *City of Louisville* compelling, authoritative, and applicable to the facts in this case. In regard to Corman's estimates of accident litigation and clean-up costs, such predictions are highly speculative and incapable of reasonable ascertainment, making them irrelevant to the valuation process. Among the considerations required for such a claim are the projected speed and volume of both rail and highway traffic over the next twenty years; the type and efficacy of the particular safety devices installed at each crossing; and the cost and availability of liability insurance, this latter factor being excluded from the railway's estimates. Taken together, such hypothetical expenses are far too uncertain for any reasonable buyer or seller to consider them in assessing the fair market value of the railroad right-of-way.

■ A separate basis underpins the exclusion of maintenance and operational expenses from just compensation considerations. Whereas Sections 13 and 242 of the Kentucky Constitution require just compensation when private property is taken for public use, "a valid exercise of the *police power* resulting in expense or loss of property is not a taking of property without due process of law or without just compensation." *City of Shively v. Illinois Cent. R.R. Co.,* Ky., 349 S.W.2d 682, 685 (1961). *Accord Newport Municipal Housing Commission v. Turner Advertising Inc.,* Ky., 334 S.W.2d 767, 769 (1960).

■ The police power differs from the Commonwealth's inherent authority to condemn private property in that this "power authorizes regulation and destruction of property without compensation if it promotes the general welfare of the citizens." *V.T.C. Lines, Inc. v. City of Harlan,* Ky., 313 S.W.2d 573, 575 (1957). *See also* 16A Am.Jur.2d, Constitutional Law § 365 (describing differences between eminent domain and the police power in a takings context). On this ground the Court in *City of Louisville* opined:

Public streets and highways are as essential for the convenience and benefit of the public as are railroads. It is indispensable that they should be established across railroads; and, when so opened, the state in the exercise of its *police power* may demand from the company that these highways and street crossings shall be so constructed, maintained, and protected as not to unnecessarily endanger the lives of persons rightfully using them.

114 S.W. at 749.

■ The exercise of the police power is not unlimited, for when government regulation "goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322, 326 (1922). *See also Commonwealth, Nat. Resources & Envtl. Protection Cabinet v. Stearns Coal & Lumber Co.*, Ky., 678 S.W.2d 378 (1984); *Commonwealth, Dep't Nat. Resources & Envtl. Protection v. Stephens*, Ky., 539 S.W.2d 303 (1976). Nonetheless, our courts have consistently denied railroads compensation for the maintenance of crossings and the related safety equipment. *See City of Shively v. Illinois Cent. R.R. Co., supra; Louisville & Nashville R.R. Co. v. City of Louisville*, 190 Ky. 214, 227 S.W. 160 (1921); *City of Newport v. Louisville & Nashville R.R. Co.*, 174 Ky. 799, 192 S.W. 838 (1917); *City of Louisville, supra*, at 125, 114 S.W. 743; *See also Chicago, B. & Q. R.R. Co. v. Chicago*, 166 U.S. 226, 255, 17 S.Ct. 581, 592, 41 L.Ed. 979, 991 (1897) (denying a railroad compensation for "erecting gates, planking the crossing, and maintaining flagmen"); 4A Nichols on Eminent Domain § 15.13[1] (3rd ed., 1999) (noting that "increased operating expenses resulting from the crossing are not recoverable").

■ Railroads must also acquiesce to certain safety regulations, although burdensome, as "part of the consideration required for the right [of the railroad] to exercise the power of eminent domain and the other franchises and privileges enjoyed." *City of Louisville, supra*, at 749. In many respects, these obligations parallel the encumbrances that private property holders must bear under the police power. By accepting special privileges, a railroad yields itself to "such regulations as are reasonably necessary for the health, safety, and welfare of the community, even if the value of the franchise is thereby impaired." 36 Am.Jur.2d, Franchises § 39.

In *City of Louisville*, the Court further explained why such uncompensated obedience is often required:

The charter of the appellant company conferred upon it the power of eminent domain, giving it the right to acquire by purchase or condemnation land needed for its use in the service of the public. Having conferred upon it this power and the privileges incident thereto, the state in the interests of the public reserved the right to make such reasonable regulations concerning it as the public good might require.

114 S.W. at 749. *Accord Chicago, B. & Q. R.R. Co. v. Chicago, supra; Chicago, M. & S.P. R. Co. v. City of Minneapolis*, 232 U.S. 430, 34 S.Ct. 400, 58 L.Ed. 671 (1914). *See also Panhandle Eastern Pipe Line Co. v. State Hwy. Comm.*, 294 U.S. 613, 622, 55 S.Ct. 563, 567, 79 L.Ed. 1090, 1097 (1935) (noting the continued validity of this rule, but limiting it to the maintenance of railroad crossings and similar circumstances where there is "substantial risk of injury to the public ... and ground to imply the company's consent to take such measures as may be necessary to prevent the hazard").

Although the Commonwealth no longer grants "charters" to railroad companies, the practice having been abolished in 1891

by Section 59(19) of the current constitution, we observe that railroads still benefit from many of the privileges of their "quasi-public" corporate status. For instance, railroads still enjoy the power of eminent domain, much as they did at the time of the *City of Louisville* decision. *See* KRS 416.010; 277.060; *Riley v. Louisville H. & St. L. Ry. Co.*, 142 Ky. 67, 133 S.W. 971 (1911); *Louisville & N.R. Co. v. Sutton,* Ky., 436 S.W.2d 487 (1969); *Eaton Asphalt Paving Co. v. CSX Transp.*, Ky.App., 8 S.W.3d 878 (1999). Moreover, Mr. Capito relied entirely upon Corman's franchise rights, such as the railroad's exclusive right to act as a rail carrier along the Memphis Line corridor, in estimating fair market value of the right-of-way.

■ Whether based on the police power, or the reciprocal benefits which accompany the grant of franchise rights by the State, Corman cannot expect compensation for the maintenance and operational expenses of the condemned crossings. "Just compensation means a compensation that would be just in regard to the public, as well as in regard to the individual." *Chesapeake & O. Canal Co. v. Key*, 5 F. Cas. 563 (C.C.D.C.1829) (No. 2,649). No property holder is entitled to more.

Assuming, arguendo, that litigation and operational expenses are relevant and proper valuation factors in this matter, Mr. Capito's appraisal still violates the longstanding prohibition against fixing prices for individual items of damage, then totaling those damages for a claim against the State. *Commonwealth, Dep't of Highways v. Sherrod, supra,* at 854; *Commonwealth, Dep't of Highways v. Tyree, supra,* at 477–478; *Commonwealth, Dep't of Highways v. Stamper,* Ky., 345 S.W.2d 640 (1961). For example, at the "Auburn Crossing," Mr. Capito computed damages of $211,518.00, which he then subtracted from his estimate of the "before" value of the railroad

right-of-way in order to arrive at an "after" value. Such a practice, commonly known as "price-tagging," can easily result in excessive awards by allowing damages for discrete harms, rather than focusing on how these harms affect the fair market value of the property at issue. *See Tyree, supra,* at 478.

■ Corman argues that Mr. Capito's use of the capitalization of net income approach, or income approach, to estimate the fair market value of the right-of-way insulates the railroad from a charge of "price-tagging." The income approach predicts market value "by analyzing a property's capacity to produce income and converting this potential into an indication of fair market value." 7 Nichols, *supra,* at § 4.04[3][c]. This technique is one of three generally recognized methods of valuation in condemnation cases, the other two being the sales comparison approach, a variant of which was used by the Department's valuation expert, and the cost approach. *See Commonwealth, Dep't of Highways v. Congregation Anshei S'Fard,* Ky., 390 S.W.2d 454, 456 (1965); 7 Nichols, *supra,* at § 4.04[3]. *See also* Arthur G. Rahn, *Across the Fence Methodology for Valuation of Rail Corridors: What is it and how is it Used?* 69 Appraisal J. 270 (2001) (comparing the utility of each valuation approach in appraising railway right-of-ways).

■ Corman asserts that because "just compensation" is a function of just two numbers, the fair market value of the property before and the fair market value after the taking, and because the income method produces two such numbers, there is no need for this Court to inquire into the relevance of the individual factors used by their expert in valuing the right-of-way. We disagree.

In effect, Corman has sought to elevate the income method above all judicial scrutiny, thereby allowing the railroad to consider any irrelevant or non-compensable factor in its valuation calculus. We are unaware of any such constraint on the courts, and would point out that in *Tyree, supra*, we opined that it is a judge's responsibility to gauge the competency of witnesses and the relevancy of testimony. 365 S.W.2d at 476–477.

Nonetheless, in some circumstances the income method can provide a reliable indication of the fair market value of condemned property. *See Commonwealth, Dep't of Highways v. Tanner*, Ky., 424 S.W.2d 384 (1968); *Commonwealth, Dep't of Highways v. Whipple*, Ky., 392 S.W.2d 81 (1965). Most jurisdictions, however, limit use of the income method to situations where "profits are derived from the intrinsic nature of the real estate itself, as distinguished from the profits derived from a business operated on the land." 27 Am.Jur.2d, Eminent Domain §§ 431. *See also* 5 Nichols, *supra*, at §§ 19.01, 19.06[1]. The approval of the income methodologies used in both *Tanner* and *Whipple* is consistent with this restriction.

With this in mind, if "assessing the value of property on the basis of income, care must be taken to distinguish between income from the property and income from the business conducted upon the property." 4 Nichols, *supra*, § 12B.09. *See also* 27 Am.Jur.2d, Eminent Domain §§ 286, 431. Here, there are clear indications that Mr. Capito failed to separate any effect the crossings may have had upon the railway business from their effect on the market value of the right-of-way as a property right. The excessiveness of Corman's claim, totaling more than one million dollars for the six condemned crossings, raises this suspicion.

It is axiomatic that injuries to a business and loss of profits are non-compensable measures of value in eminent domain proceedings. *Commonwealth, Dep't of Highways v. Siler*, Ky., 487 S.W.2d 926 (1972); *Commonwealth, Dep't of Highways v. Rogers, supra; Commonwealth, Dep't of Highways v. Fister*, Ky., 373 S.W.2d 720 (1963); *Commonwealth, Dep't of Highways v. Sherrod, supra; Commonwealth, Dep't of Highways v. Smith*, Ky., 358 S.W.2d 487 (1962); *Newport Municipal Housing, supra; Siding Sales, Inc. v. Warren County Water District*, Ky.App., 984 S.W.2d 490 (1998); 26 Am.Jur.2d, Eminent Domain § 285; 5 Nichols, *supra*, at § 19.06[1]. Lost profits are "too intangible in nature, depend too much on the good will and skill of the operator, to be considered as an element in fixing value." *Smith, supra*, at 488. Instead, a property owner may only consider how the condemnation affects the market value of the property, not how the taking affects him or her personally. *Sherrod, supra*, at 854; *Newport Municipal Housing Commission, supra*, at 770; *Henderson v. City of Lexington*, 132 Ky. 390, 111 S.W. 318, 325 (1908).

In the present matter, Mr. Capito's compensation estimates exceeded that of the Commissioners by more than ten-fold. The Department's expert, in comparison, found *no change* in the fair market value of the right-of-way as a result of the crossing condemnations. Whether or not Mr. Capito improperly valued the Memphis Line as a business rather than as a property right, his calculations rested upon incompetent and irrelevant factors, rendering his estimates invalid.

By choosing to rely *entirely* on non-compensable and irrelevant measures of value in assessing the fair market value of the railway, Corman has placed itself in an unenviable position. Valuation esti-

mates based solely or primarily on such improper factors are subject to a motion to strike. *Commonwealth, Dep't of Highways v. Shaw,* Ky., 390 S.W.2d 161 (1965); *West Kentucky Coal Co. v. Commonwealth, Dep't of Highways,* Ky., 368 S.W.2d 738, 743 (1963); *Tyree, supra,* at 476. Had the Department moved to strike Mr. Capito's testimony at trial, Corman would be left with no competent valuation evidence to place before the jury.

Normally, summary judgment is authorized in cases such as this where "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03. However, Section 242 of the Kentucky Constitution provides that upon "appeal from any preliminary assessment of damages," in this instance the award of $94,000 by the Commissioners, "the amount of such damages shall, in all cases, be determined by a jury, according to the course of the common law." *See also* KRS 416.620(1).

It is somewhat ironic that Corman now seeks the shelter of this particular constitutional provision. The constitutional debates indicate that Section 242 was originally enacted to protect the due process rights of individuals who stood to lose property to corporations, such as *railroads,* endowed with the power of eminent domain:

> It is a well known fact, where there were condemnations under charters granted to corporations in this state, it has been attempted to deprive individuals of the right of appeal from a preliminary assessment, and it is proper that the Constitution should require that, where there is a mere preliminary assessment where the property holder

could not be heard, it should be beyond the power of the General Assembly to ever deprive him of an appeal. We provide also that upon an appeal from such preliminary assessment, the amount of damages shall in all cases be determined by a jury, according to the common law.

Constitutional Debates, Vol. 4, page 4725 (1890). Section 242, however, is "designed to protect the condemnor as well as the condemnee." *Sherrod, supra,* at 854. Furthermore, this section provides an important safeguard against the misuse of the eminent domain power. *See generally Commonwealth, Dep't of Highways v. York,* Ky., 390 S.W.2d 190, 193 (1965) (Moremen, C.J., dissenting). Corman falls well within the ambit of this constitutional guarantee.

■ Summary judgment allows a trial court to terminate litigation when it appears there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *Commonwealth, Dep't of Parks v. Whitworth,* Ky., 74 S.W.3d 695, 698 (2002); *City of Florence v. Chipman,* Ky., 38 S.W.3d 387, 390 (2001). *See also Steelvest, Inc. v. Scansteel Service Ctr., Inc.,* Ky., 807 S.W.2d 476 (1991); *Paintsville Hosp. Co. v. Rose,* Ky., 683 S.W.2d 255 (1985). This procedure permits courts to "expedite the disposition of cases and to avoid unnecessary trials where no genuine issues of material fact are raised." *Steelvest, supra,* at 482.

■ Our decisions have stressed that summary judgment is not a substitute for trial, and is only appropriate "when it appears impossible for the nonmoving party to produce evidence at trial warranting a judgment in his favor." *Id.* When faced with a motion for summary judgment, the role of the trial judge is not to decide issues of fact, but instead he or she must determine whether a real issue exists. *City of Florence, supra,* at 390.

The record provides ample documentation that the Department met its initial burden of proof. In its motion for summary judgment, the Department established Corman's inability to present competent evidence at trial regarding the fair market value of the Memphis Line right-of-way. Once this burden was met it was necessary for Corman, in order to avoid summary judgment, to offer at least some affirmative evidence demonstrating the existence of a genuine issue of material fact for trial. *Id.; Steelvest, supra*, at 482. The threshold here is quite low; nevertheless, Corman presented no new evidence.

■ With no compensation issue for the jury to decide, the trial court could find the Department entitled to a judgment in its favor as a matter of law. Lacking a jury question, no violation of Section 242 occurred. We would expect this case, however, to be the exception rather than the norm, for only under the most unusual circumstances would a party fail to offer *any* competent evidence regarding the fair market value of property in a condemnation case. To state this another way, a party that presents *any* competent evidence relating to fair market value would necessarily create a material issue of fact, and would therefore survive a motion for summary judgment.

As a final matter, we must briefly address Corman's claim that the Interstate Commerce Commission Termination Act, codified at 49 U.S.C. §§ 10501 *et seq.*, preempts any measure of "just compensation" that requires the railroad to bear some of the costs associated with crossing condemnations. We observe that Corman, in its June 2000, brief before the circuit court, stated that "it does not appear Federal Law will preempt any Kentucky law in this case." Although we find this argument intriguing, we decline further review of this issue.

For the reasons stated herein, we reverse the decision of the court of appeals, affirm the summary judgment granted by the Logan Circuit Court and remand this matter to the circuit court for the determination of nominal damages.

LAMBERT, C.J., COOPER, GRAVES, and JOHNSTONE, JJ., concur.

WINTERSHEIMER, J., dissents in a separate opinion in which KELLER and STUMBO, JJ., join.

Justice WINTERSHEIMER, dissenting.

I must respectfully dissent from the majority opinion because the railroad company is entitled to just compensation for the establishment of a highway or street over its line or right of way whether the company is owner of the fee simple or merely holds an easement for the right of way. Moreover, the railroad is entitled to just compensation for an easement taken for the construction of a grade level railroad crossing. The railroad property is entitled to the same constitutional protection as individual property.

Section 242 of the Kentucky Constitution provides that in condemnation proceedings, the amount of damages shall "in all cases, be determined by a jury, according to the course of the common law." I accept the fact that not every acquisition of an easement over a railroad crossing amounts to a compensable taking. There must be competent evidence of a diminution as a result of the acquisition in order for it to constitute a compensable taking. Unless there is such competent evidence there is no issue for a jury to decide. The only damage is the difference in market value before and after the taking and that is the only issue to be submitted to a jury. *Commonwealth, Dept. of Highways v. Sherrod*, Ky., 367 S.W.2d 844 (1963), is the

seminal case in this area. *See also* KRS 416.660.

The problem in this case arises from the application of the statutory and precedential principles. Here, Corman produced only one valuation witness who intended to testify at trial regarding the before and after values of the property that would result from a reduction in the value of the railroad as a result of the crossings imposed. The witness intended to project the expenses based on a number of accidents anticipated over twenty years and then reduce to annual added expense in order to arrive at the proposed reduction in value. The question then becomes whether the analysis was based on a legally compensable element of value.

This case was decided as a summary judgment, and it has long been held that in such a case there is an obligation to present at least some affirmative evidence showing that there is a genuine issue of material fact for trial. CR 56.03. Summary judgment should be cautiously applied and should not be a substitute for trial. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, Ky., 807 S.W.2d 476 (1991). The Transportation Cabinet presented a witness who determined that there was no decrease in value of the property as a result of the grade level crossings. The circuit judge accepted the argument of the defendant and granted summary judgment.

I note that the capitalization of net income approach to determining the before and after fair-market value of a parcel of commercial property in a condemnation action has been approved in Kentucky. *Commonwealth, Dept. of Highways v. Tanner*, Ky., 424 S.W.2d 384 (1968). I agree with Corman, that the capitalization of net income approach does not violate the prohibition of "price-tagging" denounced in *Sherrod, supra*. Although there will always be clearly identifiable factors affecting the net income to be capitalized, such factors do not amount to separate items of damage.

As noted in *Sherrod* at page 849, the landowner is not entitled to loss of profits, but he is limited to a loss of market value. *Sherrod* also indicated that the proper construction of the constitution, Sections 13 and 242, requires that benefits be taken into consideration in determining the total loss of value the owner has sustained. The *Sherrod* court was considering the question of offsetting benefits.

Condemnation evaluations are truly a battle of experts. Such individuals should be allowed to consider the various factors related to the railroad crossing both before and after condemnation. The real issue in this case is the fair market value of the railroad after easements for the six grade crossings. A factor to be considered is any increases in operating expenses that would decrease the market value. The jury should be permitted to decide, and the capitalization of net income, an accepted valuation measure, should be valid testimony as presented by a qualified expert. Summary judgment was inappropriate and the matter should be permitted to go to the jury on the issue of damages.

KELLER and STUMBO, JJ., join this dissenting opinion.